[No. B169455. Second Dist., Div. Four. Mar. 2, 2004.]

FIRE INSURANCE EXCHANGE et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LYDIA ALTMAN et al., Real Parties in Interest.

## COUNSEL

Hollins & Schechter, Eric N. Riezman; Shea, McNitt & Carter, Lawrence W. Shea, Jeffrey J. Leist; Horvitz & Levy, Lisa Perrochet and Julie L. Woods for Petitioners.

No appearance for Respondent.

John N. Quisenberry, James G. Bernald and Heather M. Mason for Real Parties in Interest.

OPINION

HASTINGS, J.—

## BACKGROUND

A group of homeowners (real parties) whose homes were damaged or destroyed in the 1994 Northridge earthquake brought an action against Fire Insurance Exchange and Farmers Insurance Exchange (petitioners) to recover under their policies and for damages, alleging breach of contract, insurance bad faith, fraud, and negligence.

Real parties' first amended complaint alleges that at the time of the earthquake, their homes were insured under the "Fourth Edition" "Protector Plus Homeowners Package Policy," with "Guaranteed Replacement Cost Coverage," issued by Fire Insurance Exchange.[1] It is alleged that real parties repaired or rebuilt their homes, and in doing so, incurred costs for land stabilization and for construction upgrades made necessary by changes to the building code, and that petitioners denied their claims for such costs.

The matter was assigned to Los Angeles Superior Court Judge Carl West. For case management purposes, prior to setting the matter for trial, Judge West resolved disputed issues raised by the pleadings regarding the interpretation of the policy terms upon which coverage depended.[2]

The court found the policy to be ambiguous and exclusions relating to damage to land and building code upgrades to be invalid and unenforceable. On August 22, 2003, petitioners filed a petition for writ of mandate or prohibition, and on November 20, 2003, we issued an order to show cause and ordered real parties to file a written return.

## DISCUSSION

■ We have construed the trial court's case management order as a denial of a motion for judgment on the pleadings with regard to the alleged causes of action, insofar as they are based upon coverage for costs for land stabilization and for construction upgrades made necessary by changes to the building

---

[1] The first amended complaint alleges that Fire Insurance Exchange issued the policy, that Farmers Insurance Exchange was responsible for providing adjusting services, and that both companies were reciprocal insurers and members of the Farmers Group, Inc. (See generally Ins. Code, § 1300 et seq.; *Lee v. Interinsurance Exchange* (1996) 50 Cal.App.4th 694, 702–705 [57 Cal.Rptr.2d 798].)

[2] A trial court may make its own motion for judgment on the pleadings. (Code Civ. Proc., § 438, subd. (b)(1), (2).) Here, the trial court's case management order had the effect of denying its own motion for judgment on the pleadings.

code.[3] The denial of a motion for judgment on the pleadings may be reviewed by means of a petition for writ of mandate. (See *American Internat. Group, Inc. v. Superior Court* (1991) 234 Cal.App.3d 749, 755 [285 Cal.Rptr. 765].) And a case-management order is properly reviewed by petition for writ of mandate. (See e.g., *Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 291–292 [4 Cal.Rptr.3d 883].)

■ A motion for judgment on the pleadings is the functional equivalent of a general demurrer. (*American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1118 [51 Cal.Rptr.2d 251, 912 P.2d 1198].) Ordinarily, a general demurrer does not lie as to a portion of a cause of action, and if any part of a cause of action is properly pleaded, the demurrer will be overruled. (*Campbell v. Genshlea* (1919) 180 Cal. 213, 217 [180 P. 336].) The trial court has broad discretion, however, to fashion suitable methods of practice in order to manage complex litigation. (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 [67 Cal.Rptr.2d 16, 941 P.2d 1203].) Accordingly, "courts have the power to fashion a new procedure in a complex litigation case to manage and control the case before them." (*Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1380 [5 Cal.Rptr.2d 882].)

The trial court deemed the resolution of the issues presented here to be critical to the management of this litigation and the 600 other earthquake cases pending before the court with similar issues. In its statement of decision, the court invoked Code of Civil Procedure section 166.1, which provides that "a judge may indicate in any interlocutory order a belief that there is a controlling question of law as to which there are substantial grounds for difference of opinion, appellate resolution of which may materially advance the conclusion of the litigation."

Since the unusual procedure undertaken by the trial court was within its power to manage complex litigation, and the parties agreed to it and no objection has been made in these proceedings, we shall not invoke the usual rule pertaining to general demurrers, but will determine whether real parties' causes of action may be based upon either or both of the two claimed coverages.

■ In deciding or reviewing a judgment on the pleadings, all properly pleaded material facts are deemed to be true, as well as all facts that may be implied or inferred from those expressly alleged. (*Treweek v. City of Napa* (2000) 85 Cal.App.4th 221, 233 [101 Cal.Rptr.2d 883].) A ruling on a motion for judgment on the pleadings "resolves a mixed question of law and fact that is predominantly one of law, viz., whether or not the factual allegations that

---

[3] See footnote 2, *ante.*

the plaintiff makes are sufficient to constitute a cause of action. [Citation.] The resolution of a question of this sort calls for examination de novo. [Citation.]" (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 515 [101 Cal.Rptr.2d 470, 12 P.3d 720].)

■ Further, where the facts are undisputed, the interpretation of an insurance policy is a question of law. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) We are not bound by the trial court's interpretation of an insurance policy, but must independently interpret its provisions. (*Brodkin v. State Farm Fire &' Casualty Co.* (1989) 217 Cal.App.3d 210, 216 [265 Cal.Rptr. 710].) Our goal is to determine the mutual intention of the parties at the time the policy was created, and such intent should be inferred, if possible, solely from the written terms of the policy. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822 [274 Cal.Rptr. 820, 799 P.2d 1253].) "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.]" (*Id.* at p. 822.)

## A. Cost of Repairing Land Beneath the Covered Dwelling

■ Petitioners' first contention is that the trial court erred in finding that the replacement cost coverage in the "Protector Plus" policy includes the cost of repairing the land under damaged or destroyed buildings, when such repair is necessary before the buildings can be repaired or replaced. We agree. The absence of insurance coverage for damage or injury to land is both "clear and explicit" in the Protector Plus policy. It is error to fail to apply the plain, unambiguous language of an insurance policy. (*Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1073 [135 Cal.Rptr.2d 361, 70 P.3d 351]; Civ. Code, § 1644.)

The policy insures loss to three types of property. "Coverage A" insures against loss to the insured's "*dwelling*, including attached *structures*, on the residence premises used principally as [the insured's] private residence"; "Coverage B" insures against loss to the insured's "separate *structures*," which are also referred to as "other *structures* on the residence premises"; and "Coverage C" insures against loss to "personal property." (Italics added.) The policy defines "residence premises" as "the one or two family *dwelling* and separate *structures* or that part of any other *building* where [the insured] reside[s], and which is shown in the Declarations." (Italics added.)[4]

---

[4] Since no declarations pages have been included in the record, we do not reach the issue of what clarifying effect, if any, the declarations pages may have had upon the policy. We decide only whether the complaint states a cause of action under the two claims of coverage, damage to land and building code upgrades.

Real parties contend that controlling authority for the trial court's ruling is found in *Strickland v. Federal Ins. Co.* (1988) 200 Cal.App.3d 792 [246 Cal.Rptr. 345] (*Strickland*), and *Snapp v. State Farm Fire & Cas. Co.* (1962) 206 Cal.App.2d 827 [24 Cal.Rptr. 44] (*Snapp*), where the term "dwelling," as used in the subject homeowner's policies, was interpreted as including the land underlying the covered building. (*Snapp, supra,* 206 Cal.App.2d at p. 833; *Strickland, supra,* 200 Cal.App.3d at p. 799.) There is no similarity in the circumstances of this case and *Snapp* or *Strickland.* In each of those cases, the policy before the court was interpreted as providing policy limits where the covered peril (earth movement) was a continuing one, so that the insurer's obligation with regard to resulting damage to the residence would continue so long as the underlying soil remained unstable, and the cost of stabilizing the land far exceeded policy limits. (*Strickland, supra,* 200 Cal.App.3d at pp. 797–798; *Snapp, supra,* 206 Cal.App.2d at pp. 832–833.)

■ We find nothing in either case that requires the definition of *dwelling* to include land in all insurance policies. Neither case recites policy language remotely similar to the Protector Plus policy, other than providing coverage for the insured's " dwelling." In construing the policy before us, it is not our function to select a particular definition of a single word and apply it without regard to other language in the policy. (See *Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 808 [180 Cal.Rptr. 628, 640 P.2d 764].) " 'Ambiguity is not necessarily to be found in the fact that a word or phrase isolated from its context is susceptible of more than one meaning.' [Citation.]" (*Castro v. Fireman's Fund American Life Ins. Co.* (1988) 206 Cal.App.3d 1114, 1120 [253 Cal.Rptr. 833].) An insurance policy must be interpreted as a whole and in context. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 18.)

Thus, moving beyond the single word, "dwelling," we find the following language under "**SECTION I—PROPERTY, Coverage A**": "*We do not cover land or the value of land, including land on which the dwelling is located, or the cost to restore, replace, repair or rebuildland.* If a covered loss causes damage to the dwelling and to the land on the **residence premises** *we do not cover any increased cost to repair or rebuild the dwelling because of damage to the land.*" (Italics added.)[5]

In the same section, under "**Coverage B—Separate Structures,**" the policy states: "We cover other *structures* on **the residence premises.** . . . [¶] *We do not cover land or the value of land, including land on which the separate structure is located, or the cost to restore, replace, repair or rebuild*

---

[5] All boldface material quoted in this opinion was in boldface in the original. We have added none.

*land.* If a covered loss causes damage to a separate structure and to the land on the **residence premises,** *we do not cover any increased cost to repair or rebuild the separate structure because of damage to the land.*" (Italics added.)

■ Thus, even if the word, "dwelling," were interpreted as including the land under a house, regardless of its use in a particular policy, the Protector Plus policy would unequivocally and clearly exclude coverage for that part of a "dwelling." Express coverage limitations must be respected. (*Fidelity & Deposit Co. v. Charter Oak Fire Ins. Co.* (1998) 66 Cal.App.4th 1080, 1086 [78 Cal.Rptr.2d 429].)

Real parties contend that the trial court correctly resolved an ambiguity in the policy created by providing guaranteed replacement cost coverage, but excluding the cost to repair land, when such repair is required before a building can be replaced. "Any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer. If semantically permissible, the contract will be given such construction as will fairly achieve its manifest object of securing indemnity to the insured for the losses to which the insurance relates. Any reasonable doubt as to uncertain language will be resolved against the insurer." (*Crane v. State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129].)

■ A policy term is considered ambiguous when it is capable of two or more constructions, but only if both are reasonable. (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648 [3 Cal.Rptr.3d 228, 73 P.3d 1205].) To determine whether both constructions are reasonable, the term must be considered in light of the language of the whole policy, " 'and cannot be found to be ambiguous in the abstract.' [Citation.]" (*Id.* at p. 648; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].)

The policy explains guaranteed replacement cost coverage in Section I, under "**ADDITIONAL COVERAGES**." Paragraph 9 is entitled, "*Guaranteed Replacement Cost Coverage–Buildings.*" (Italics in the original.) It states: "We will settle covered loss to *buildings* under Coverage A—Dwelling and Coverage B—Separate Structures at replacement cost regardless of the limits of insurance shown on the Declarations Page, subject to the following provisions: [¶] . . . [¶] *We do not cover any costs required to replace, rebuild, stabilize or otherwise restore the land.*" (Italics added.)

Thus, although guaranteeing the replacement of a damaged home may be inconsistent *in the abstract* with excluding the cost of repairing damaged land so that the replacement can be built upon it, the clear, explicit, and oft-repeated language of the Protector Plus policy is not reasonably susceptible to

an interpretation including such coverage. (See *MacKinnon v. Truck Ins. Exchange, supra,* 31 Cal.4th at p. 648.)

Real parties contend that their earthquake endorsement renders the land damage exclusion ambiguous, because an insured might reasonably expect the earthquake endorsement to override the land damage exclusion. We disagree.

Under **"SECTION I—LOSSES NOT INSURED,"** the Protector Plus policy enumerates perils that are excluded from coverage, including earth movement. The excluded perils expressly apply to Coverage A and B, the dwelling and separate structures, and Coverage C, personal property. The earthquake endorsement "supersedes and controls anything to the contrary." Thus, since the exclusion for earth movement from Coverages A, B, and C is contrary to the endorsement's coverage for earthquake, the endorsement controls, and earthquake is not excluded from Coverage A, B, or C.

■ The endorsement is, however, "subject to all other terms of the policy," and as the policy makes explicit and clear, Coverages A, B, and C do not include damage to land. An endorsement overriding an excluded peril is not inconsistent with coverage for loss to buildings only; and we may not indulge in a strained interpretation to create an ambiguity where none exists. (See *Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at pp. 18–19; *Reserve Insurance Co. v. Pisciotta, supra,* 30 Cal.3d at p. 807.)

The trial court found the earthquake endorsement to be ambiguous, because it contains two "special exclusions" for loss "[c]aused directly or indirectly by flood of any nature or tidal wave resulting from or made worse by earthquake," and loss "[t]o exterior masonry veneer other than stucco." The court found the special exclusions to be inconsistent with the language making the endorsement "otherwise subject to all other terms of the policy." We do not follow the court's logic. The insertion of two "special exclusions" is not inconsistent with making any remaining terms of the policy applicable, so long as the remaining terms are not inconsistent with the endorsement.

■ The trial court explained, "Since by its very nature an earthquake involves land movement, it would be unreasonable to conclude that an individual buying earthquake coverage would not expect coverage for land stabilization necessary to restore his residence to its pre-earthquake condition."[6] An expectation of coverage, however, cannot *create* an ambiguity; it is

---

[6] Apparently the court believed that earthquakes always or usually damage land, and repairing or reconstructing buildings is always or usually impossible without first repairing the land. Neither the record nor common knowledge supports such a view, and real parties have not so alleged.

merely an interpretive tool used to resolve an ambiguity once it is found to exist. (*Wolf Machinery Co. v. Insurance Co. of North America* (1982) 133 Cal.App.3d 324, 328 [183 Cal.Rptr. 695].)

▮ In any event, even if there is an ambiguity, we must determine whether the insured's expectations are reasonable in relation to the terms of the particular insurance policy to be construed, not as a general proposition. (See *MacKinnon v. Truck Ins. Exchange, supra,* 31 Cal.4th at p. 648; *Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1264.)

Real parties provided extrinsic evidence in the form of an internal memorandum, which they interpret as an admission that the endorsement is ambiguous. The memorandum proposed that "Guaranteed Replacement Cost Coverage," be changed to read, "Extended Replacement Cost Coverage," because "courts may have used the term 'guaranteed' to void the land limitation."

▮ The goal of insurance policy interpretation, like any contract interpretation, is to determine the mutual intention of the parties at the time the policy was issued, and that intention is to be inferred, if possible, solely from the terms of the policy. (*AIU Ins. Co. v. Superior Court, supra,* 51 Cal.3d at pp. 821–822; Civ. Code, §§ 1636, 1639.) We find that in light of the clear, explicit, and repeated language of the policy, it is not reasonably susceptible to the trial court's interpretation. Thus, there is no need to consider extrinsic evidence. (*Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 435 [204 Cal.Rptr. 435, 682 P.2d 1100].)

In any event, in our view, the proposal does not acknowledge an ambiguity any more than evidence of a rejection of the proposal would establish clarity. At most, the memorandum suggests that someone in petitioners' organization might have thought that some courts might interpret the word, "guaranteed," too expansively, but there is no acknowledgement or even a suggestion that such an interpretation would be reasonable or that it was intended.

Thus, we agree with petitioners that the trial court erred in rejecting the plain, unambiguous language of the policy. (See *Rosen v. State Farm General Ins. Co., supra,* 30 Cal.4th at p. 1073.)

B. *Increased Costs Resulting from Changes in Building Codes*

We turn to petitioners' contention that the trial court erred in finding that the policy provides coverage for the increased costs of repair or replacement of damaged or destroyed buildings, when such increased costs are caused by the need to conform to changes in the building codes.

Petitioners contend that the trial court erred in relying upon the legislative history of Insurance Code section 10101 et seq., to find an ambiguity in the policy.[7] We agree. Those provisions apply only to policies issued on and after July 1, 1993, or renewed after January 1, 1994. (§ 10101, 10107.) The Legislature expressed its intent in the statute that "[n]othing in this chapter is intended to expand, contract, modify, *or otherwise affect the coverage* provided under any policy of residential property insurance issued and in effect prior to July 1, 1993." (§ 10105, italics added.) Thus, it is clear that the Legislature did not intend that section 10101 et seq. provide an aid to the interpretation of insurance policies issued on before July 1, 1993, unless they were renewed on or after January 1, 1994.

There was no allegation in the first amended complaint that the policies in question were issued on or after July 1, 1993, or renewed between January 1, 1994, and the date of the earthquake, January 17, 1994, and there is no cause of action based upon a violation of or compliance with the disclosure requirements of section 10102. Since sections 10101 et seq. are therefore inapplicable to the causes of action alleged in the first amended complaint, the trial court should not have relied upon them, and we shall not do so in our independent review.

Petitioners contend that increased costs due to changes in the building codes are excluded by the following policy language: "We do not insure for loss either consisting of, or caused directly or indirectly by: [¶] . . . [¶] 5. Enforcement of any ordinance or law regulating construction, repair or demolition of a building or other structure, unless endorsed to this policy."[8]

We agree that the language is susceptible to such an interpretation, and that one California court has so interpreted it. (See e.g., *Bischel v. Fire Ins. Exchange* (1991) 1 Cal.App.4th 1168, 1178 [2 Cal.Rptr.2d 575] (*Bischel*).) The *Bischel* court reasoned that a similar exclusion was authorized by Insurance Code section 2071, which provides standard policy terms for residential property insurance policies. (*Bischel* at p. 1178.) Petitioners contend that the Protector Plus policy complies with section 2071, and that *Bischel's* reasoning is applicable here. We disagree with both contentions.

■ Insurance Code section 2071 sets forth the standard form fire insurance policy.[9] All fire insurance policies in California must be on the

---

[7] Section 10102 requires the insurer to serve upon the insured a disclosure with regard to whether the guaranteed replacement cost coverage in a residential property insurance policy includes the cost of complying with changes in the building codes.

[8] We shall follow petitioner's lead and henceforth refer to this provision as the "ordinance-or-law exclusion."

[9] All future statutory references are to the Insurance Code, unless otherwise indicated.

standard form. (Ins. Code, § 2070.) The form need not be used, however, if other perils are included in the policy, as here, so long as the fire coverage is substantially equivalent to or more favorable to the insured as provided by statute. (*Ibid.*) As long as the language of the policy is substantially similar to the standard form, the statutory language will control. (See *State Farm Fire & Casualty Co. v. Superior Court* (1989) 210 Cal.App.3d 604, 610 [258 Cal.Rptr. 413].) Thus, an exclusion will be enforced if it substantially complies with the language of the standard form. (See *Breshears v. Indiana Lumbermens Mut. Ins. Co.* (1967) 256 Cal.App.2d 245, 247–248 [63 Cal.Rptr. 879] (*Breshears*).)

The relevant language of section 2071 is found in the following clause: "[Insurer] does insure [insured] . . . to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after the loss, without allowance for any increased cost of repair or reconstruction by reason of any ordinance or law regulating construction or repair."

We agree with petitioners and the *Bischel* court that a policy containing the language of section 2071 does not cover the increased costs of replacement due to changes in the building codes. (See *Bischel, supra,* 1 Cal.App.4th at p. 1178.) Thus, if the Protector Plus policy contained the statutory language or language substantially similar to it, we would agree with petitioners and with the reasoning of *Bischel*, and our discussion would end here. But petitioners' Protector Plus policy does not follow the standard form.[10]

The policy's replacement loss coverage is found under the heading, **"ADDITIONAL COVERAGES."** It reads in relevant part:

"9. *Guaranteed Replacement Cost Coverage—Buildings.* We will settle covered loss to buildings under Coverage A—Dwelling and Coverage B—Separate Structures at replacement cost regardless of the limits of insurance shown on the Declarations Page, subject to the following provisions:

"a. You have insured your dwelling and separate structures to 100% of their replacement cost as determined by our Building Replacement Cost Guide.

"b. You have accepted each annual adjustment in building amounts in accordance with Value Protection Clause in the policy.

". . .

---

[10] There was no finding in *Bischel* that the policy language was in substantial compliance with the statutory language, and no indication that the issue was raised.

"d. You have complied with all the 'Loss Settlement' provisions."

The " 'Loss Settlement' provisions" are found in **"SECTION I—CONDITIONS."** The relevant provision reads:

"3. *Loss Settlement.*

"*Coverage A—and B* Covered loss to Buildings under Coverage A and B will be settled at replacement cost without deduction for depreciation, subject to the following methods:

"(1) Settlement under replacement cost will not be more than the *smallest* of the following:

"(a) the replacement cost of that part of the building damaged for equivalent construction and use on the same premises.

"(b) the amount actually and necessarily spent to repair or replace the building intended for the same occupancy and use."

The "Value Protection Clause" provides: "We may increase the limit of insurance applying to Coverage A, B, C and D to reflect changes in costs of construction and personal property values. Any such increase will be made on the renewal date of this policy, or on the anniversary date of 3-year policies paid annually."

To summarize, the policy guarantees "100% of their replacement cost as determined by [petitioners'] Building Replacement Cost Guide."[11] There is no deduction for depreciation, and the amount will either be sufficient for "equivalent construction and use on the same premises" or "the amount actually and necessarily spent to repair or replace the building intended for the same occupancy and use," whichever is smaller. And the premium will be periodically adjusted to reflect increased costs of construction and property values.

Petitioners point out that the phrase "equivalent construction" has been held to be substantially similar to the language of section 2071 that limits replacement to "material of like kind and quality." (See e.g., *McCorkle v. State Farm Ins. Co.* (1990) 221 Cal.App.3d 610, 614 [270 Cal.Rptr. 492]

---

[11] Petitioner does not claim that the Building Replacement Cost Guide was ever made a part of the policy or given separately to its insureds, or even that it provided for an exclusion of increased costs due to changes in the building codes.

(*McCorkle*).) The court concluded in that case that the insurer was not required to pay for a new cement garage floor to replace a destroyed wood floor, even though a new building code required cement. (*Id.* at pp. 614–615.)

We agree with petitioners and *McCorkle* that "equivalent construction" is substantially similar to "material of like kind and quality." (*McCorkle, supra,* 221 Cal.App.3d at p. 614.) And we agree that if the language of the Protector Plus policy substantially complied with section 2071, it would be enforced without further interpretation. (See *State Farm Fire & Casualty Co. v. Superior Court, supra,* 210 Cal.App.3d at p. 610; cf. *Breshears, supra,* 256 Cal.App.2d at pp. 247–248.) But those conclusions beg the question whether there is substantial compliance with section 2071.

In general, "[s]ubstantial compliance . . . means *actual* compliance in respect to the substance essential to every reasonable objective of the statute." (*Stasher v. Harger-Haldeman* (1962) 58 Cal.2d 23, 29 [22 Cal.Rptr. 657, 372 P.2d 649].) One objective of the standard form is to promote "better understanding of policy provisions among insurers and insureds and more uniform interpretation by the judiciary." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2003) ¶ 3:35, p. 3–7.) Substantially different policy language purporting to exclude the same coverage will, of course, result in conflicting, not uniform, interpretations. (See, e.g., *Travelers Indem. Co. v. Royal Indem. Co.* (1969) 275 Cal.App.2d 554, 559–560 [80 Cal.Rptr. 197].)

The phrase "material of like kind and quality," consists of six words in an independent clause of more than 65 words. Here, not only does the phrase "equivalent construction," find itself nowhere near the ordinance-or-law exclusion, the policy does not use the modifying phrase, "without allowance for any increased cost of repair or reconstruction by reason of any ordinance or law regulating construction or repair" or any similar phrase. The language of petitioners' ordinance-or-law exclusion says nothing of *increased* costs, and we find no similar language anywhere in the policy that would connect *increased* costs to the enforcement of an ordinance or law.

Neither *Bischel* nor *McCorkle* is of any assistance in determining substantial compliance with the statutory language, as petitioners suggest. Nowhere does either opinion say that the policies before those courts included the statutory language missing from the Protector Plus policy, and neither court expressly found substantial compliance with the statute. (See *Bischel, supra,* 1 Cal.App.4th at p. 1174; *McCorkle, supra,* 221 Cal.App.3d at p. 614.) Thus, we have made our own comparison between the language of the Protector Plus policy and the language of the standard form.

We observe that the greatest difference is that they provide altogether different coverage. Section 2071 sets forth "actual cash value" coverage, which is fair market value at the time of destruction. (See *Jefferson Ins. Co. v. Superior Court* (1970) 3 Cal.3d 398, 402 [90 Cal. Rptr. 608, 475 P.2d 880]; *Cheeks v. California Fair Plan Assn.* (1998) 61 Cal.App.4th 423, 425–426 [71 Cal.Rptr.2d 568].) The Protector Plus Policy provides "replacement cost" coverage, which is intended to compensate the insured for the *shortfall* in coverage that results from rebuilding under a policy that pays only for actual cash value. (See *Conway v. Farmers Home Mut. Ins. Co.* (1994) 26 Cal.App.4th 1185, 1189 [31 Cal.Rptr.2d 883].) [12]

Thus, we cannot conclude that the Protector Plus "replacement cost" policy substantially complies with the standard form "actual cash value" policy, simply because the phrase "equivalent construction," means "material of like kind and quality." And since we conclude that the Protector Plus policy is not in substantial compliance with the statutory language of section 2071, we shall interpret the ordinance-or-law exclusion by applying the usual rules of policy interpretation. (Cf., *Breshears, supra,* 256 Cal.App.2d at pp. 247–248; *State Farm Fire & Casualty Co. v. Superior Court, supra,* 210 Cal.App.3d at p. 610.)

"[I]nsurance coverage is 'interpreted broadly so as to afford the greatest possible protection to the insured, [whereas] . . . exclusionary clauses are interpreted narrowly against the insurer.' [Citation.]" (*MacKinnon v. Truck Ins. Exchange, supra,* 31 Cal.4th at p. 648.) Petitioners suggest that, despite the usual rules of interpretation, the ordinance-or-law exclusion should not be narrowly construed against the insurer in this instance, because "sound policy reasons" preclude payment of the increased costs of complying with building codes.

 There is no public policy, as petitioners suggest, against enforcing policies that provide replacement costs over and above actual cash value. (Cf., *Fraley v. Allstate Ins. Co.* (2000) 81 Cal.App.4th 1282 [97 Cal.Rptr.2d 386]; *Unetco Industries Exchange v. Homestead Ins. Co.* (1997) 57 Cal.App.4th 1459 [67 Cal.Rptr.2d 784]; *Conway v. Farmers Home Mut. Ins. Co., supra,* 26 Cal.App.4th 1185.)

In support of their contention, petitioners refer to a principle of the traditional indemnity concept of insurance articulated in *Breshears* and borrowed by *Bischel* and *McCorkle*, which states that the purpose of indemnity is to "compensate the insured for the actual loss which he has sustained

---

[12] We shall discuss the differences between the two types of coverages in greater depth within.

and not necessarily to place him in a better position than he was in at the time of the fire." (*Breshears, supra,* 256 Cal.App.2d at p. 248; *Bischel, supra,* 1 Cal.App.4th at p. 1173; *McCorkle, supra,* 221 Cal.App.3d at pp. 614–615.)

The *McCorkle* court found that the " 'like kind and quality' " or " 'equivalent construction' " language served "the purpose of fire insurance—to compensate for the actual loss sustained, not to place the insured in a better position than he or she was before the fire." (*McCorkle, supra,* 221 Cal.App.3d at pp. 614–615.)

The *Bischel* court, relying on both *McCorkle* and *Breshears,* was of the opinion that "to permit recovery of costs attributable to code compliance would ignore 'one of the traditional concepts of fire insurance which is to indemnify' "; and that " 'owners of new buildings which conform with state or local building laws are merely reimbursed for costs which they actually incurred. On the other hand, the owners of buildings which do not conform with such laws are not permitted to recover costs which they never assumed in the first place.' " (*Bischel, supra,* 1 Cal.App.4th at pp. 1173–1174, quoting *Breshears, supra,* 256 Cal.App.2d at pp. 248–249.)

The policy in *Breshears* was a traditional indemnity policy that promised to pay the *actual cash value* of the lost building, up to policy limits. (*Breshears, supra,* 256 Cal.App.2d at pp. 246–247.) Actual cash value is the fair market value of a structure at the time it is destroyed. (*Jefferson Ins. Co. v. Superior Court, supra,* 3 Cal.3d at p. 402.) Since the policy in *Breshears* did not provide *additional* coverage, the insured was entitled to no more than that, and if the court relied upon "sound policy reasons," that sound policy may be found in the ordinary rules of contract, which required the court to enforce the "mutual intention of the parties at the time the contract is formed . . . inferred, if possible, solely from the written provisions of the contract." (*MacKinnon v. Truck Ins. Exchange, supra,* 31 Cal.4th at p. 647; see Civ. Code, §§ 1636; 1639)

It appears that the coverage in *McCorkle* was also limited to actual cash value, since the court relied upon section 2071 and *Breshears,* and did not indicate that there was any additional coverage for replacement costs. (See *McCorkle, supra,* 221 Cal.App.3d at pp. 614–615.) *Bischel,* on the other hand, involved a Fireman's policy that provided "Guaranteed Replacement Cost Coverage" in language similar to the Protector Plus policy. (*Bischel, supra,* 1 Cal.App.4th at p. 1175.) Nevertheless, the court, in relying upon section 2071, *Breshears,* and *McCorkle,* appears to enunciate a public-policy rule against enforcing replacement cost policies that provide coverage in excess of actual cash value, when it observed that "[t]he common thread of these three theories is the notion that the purpose of insurance is not to put

the insured in a better position than he or she was before the loss but rather to compensate for the actual loss sustained." (*Id.* at p. 1173.)

■ *Bischel's* reasoning is circular, coming inevitably back to the construction of an *actual cash value* policy, such as the traditional indemnity policy of *Breshears* or *McCorkle*, which compensates for the "actual loss sustained," rather than a guaranteed replacement cost policy. (See e.g., *Bischel, supra,* 1 Cal.App.4th at p. 1173.) A replacement cost policy does more than an actual cash value policy: it necessarily places the insured in a better position than actual cash value would provide. (See *Conway v. Farmers Home Mut. Ins. Co., supra,* 26 Cal.App.4th at p. 1189.)

As one commentator explained, "Such windfalls . . . are inherent in 'replacement cost' policies, which obligate insurers to reimburse the insured for the actual cost of repairs and construction without deducting any amount for depreciation. For example, if an insured needed to replace a damaged roof, the insurer would be liable for the cost of the entire new roof, even if the damaged roof had been 10 years old." (Wood, *The Insurance Fallout Following Hurricane Andrew* (1994) 48 U. Miami L. Rev. 949, 951–952, fn. omitted.)

*Bischel's* underdeveloped analysis was apparently based upon the court's mistaken belief that *Breshears* involved guaranteed replacement cost coverage. Summarizing the facts of *Breshears*, the *Bischel* court stated that "the plaintiff sought benefits under his replacement cost fire policy to restore his destroyed building." (*Bischel, supra,* 1 Cal.App.4th at p. 1173.) The court's discussion did not touch upon the distinction between "actual cash value" coverage and "replacement cost" coverage.

We conclude that *Bischel* is an anomaly, and we note that its reasoning has not been followed in any published California judicial opinion. Thus, even though *Bischel* interpreted an ordinance-or-law exclusion that was substantially similar to the exclusion in the Protector Plus policy, we shall rely upon our own analysis of the ordinance-or-law exclusion. (See *Bischel, supra,* 1 Cal.App.4th at p. 1173.)

The ordinance-or-law exclusion is found under the heading, "**SECTION I—LOSSES NOT INSURED**," and the subheading, "Applying to **Coverage A and B—Dwelling and Separate Structures and Coverage C—Personal Property**." Its title leads the reader to expect a *list of categories of injuries or damages* that are excluded, but the 13 categories of exclusions enumerated in

that section relate to perils, although the word *peril* is not used.[13] The first on the list is the peril of earth movement. No. 2 is water collecting on or soaking into the ground; No. 3 is nuclear hazard; No. 4 is faulty design and construction; No. 5 is the ordinance-or-law exclusion; No. 6 is power interruption; No. 7 is neglect by the insured; No. 8 is war; No. 9 is the freezing of pipes; No. 10 is other freezing; No. 11 is theft in or to a dwelling under construction; No. 12 is vandalism to a vacant dwelling; and finally, No. 13 lists nine additional perils, and expressly refers to them as perils.

It would therefore be reasonable for an insured to interpret No. 5, "Enforcement of any ordinance or law regulating construction, repair or demolition of a building or other structure," as describing a peril, not a type of damage or loss. Indeed, similar language has been so interpreted by the courts of several other jurisdictions. (See, e.g., *Dupre v. Allstate Ins. Co.* (Colo.Ct.App. 2002) 62 P.3d 1024, 1029–1030 (*Dupre*); *Bering Strait School Dist. v. RLI Ins.* (Alaska 1994) 873 P.2d 1292, 1296; *Farmers Union Mutual Ins. Co. v. Oakland* (1992) 251 Mont. 352, 355–356 [825 P.2d 554]; *Garnett v. Transamerica Ins. Services* (1990) 118 Idaho 769, 779 [800 P.2d 656].)

The Alaska Supreme Court explained the significance of construing the enforcement of an ordinance or law to be a peril, as follows: " 'As we read this provision, it does not limit [the insurance companies'] obligation for the cost of repair or replacement of the building when a loss has occurred that is covered by the policy, but merely states that if the loss itself is caused by an ordinance or law, there is no coverage. For instance, if some safety improvement of a building to which no other loss had occurred were required by an ordinance or law, [the insurance company] would not be liable. However, when the cost of repairing or replacing a building that had been damaged by fire is increased by the requirements of an ordinance or a law, [the insurance company] is not relieved of that cost.' " (*Bering Strait School Dist. v. RLI Ins., supra,* 873 P.2d at p. 1296, quoting *Garnett v. Transamerica Ins. Services, supra,* 800 P.2d at p. 666.)

The Colorado court provided examples of such enforcement perils, such as where fire spread to the insured's building after other buildings were ordered burned by the health department to combat a plague; where a " 'drug house' "

---

[13] A peril is usually understood as the physical force that brings about the loss. (*Doheny West Homeowners' Assn. v. American Guarantee & Liability Ins. Co.* (1997) 60 Cal.App.4th 400, 405, fn. 4 [70 Cal.Rptr.2d 260].)

Apart from any endorsements, the Protector Plus policy does not enumerate covered perils, merely excluded perils, and was therefore an "all-risk" policy. (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1191 [77 Cal.Rptr.2d 537, 959 P.2d 1213].) An "all-risk" policy is one "that covers all perils generally and without enumeration except those specifically excepted, as opposed to the typical policy which specifies both included and excluded perils." (*Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 417 [257 Cal.Rptr. 292, 770 P.2d 704] (dis. opn. of Mosk, J.).)

was demolished by a city pursuant to an ordinance; and where the insured's house is negligently set afire during city-ordered fumigation. (See *Dupre, supra,* 62 P.3d at p. 1029.)

Other courts disagree and find the language of the exclusion to refer unambiguously to increased costs made necessary by changed building codes. (See e.g., *Spears v. Shelter Mut. Ins. Co.* (Okla. 2003) 73 P.3d 865, 867–869 [discussing the conflicts among the jurisdictions, and finding the exclusion clear and unambiguous]; *Dombrosky v. Farmers Ins. Co. of Wash.* (1996) 84 Wn.App. 245, 257–259 [928 P.2d 1127]; *Cohen Furniture Co. v. St. Paul Ins. Co. of Illinois* (1991) 214 Ill.App.3d 408, 412 [158 Ill.Dec. 38, 573 N.E.2d 851].)

We list these conflicting authorities not to take sides, but to illustrate our conclusion that the ordinance-or-law exclusion is reasonably susceptible to more than one interpretation. It is therefore ambiguous. (See *Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 18.)

Since the exclusion is ambiguous, it is petitioners' burden to establish that their interpretation is the only reasonable one. (*MacKinnon v. Truck Ins. Exchange, supra,* 31 Cal.4th at p. 655.) " '[W]e are not required, in deciding the case at bar, to select one "correct" interpretation from the variety of suggested readings. To affirm the trial court['s] decision[] in favor of claimants, we need not determine that the . . . interpretations proposed by the insurer are not possible, or even reasonable, interpretations of the clause in question. . . . Instead, even assuming that the insurer's suggestions are reasonable interpretations which would bar recovery by the claimants, we must nonetheless affirm the trial court['s] finding of coverage so long as there is any other reasonable interpretation under which recovery would be permitted in the instant case[].' [Citation.]" (*Ibid.*)

Petitioners contend that the ordinance-or-law exclusion cannot refer to a peril, because, they reason, it excludes increased costs resulting from building code changes, and "increased costs are not a *peril.*" We agree that increased costs are not a peril, but nowhere does the exclusion use the term, "increased costs." It excludes loss caused by or consisting of *enforcement*, which is not a cost, and which appears in a list of perils.

█ Relying on *Garvey v. State Farm Fire & Casualty Co., supra,* 48 Cal.3d at page 404, *Doheny West Homeowners' Assn. v. American Guarantee & Liability Ins. Co., supra,* 60 Cal.App.4th at page 405, footnote 4, petitioners contend that *enforcement* cannot be a peril, because *peril* means a "fortuitous, active, physical force" or an "accidental direct physical loss to property," and, they reason, enforcement is not a fortuitous or accidental physical force. The

word *peril* is not used *or defined* in the policy. And it is a technical term. (See *Doheny West Homeowners' Assn. v. American Guarantee & Liability Ins. Co., supra,* 60 Cal.App.4th at p. 405, fn. 4.) A technical meaning does not establish what an insured might reasonably expect to be included or excluded from coverage. (See *id.* at p. 405.) Not only does the Protector Plus policy not define the term, it does not contain the words, "fortuitous, active, physical force" or an "accidental direct physical loss to property"; and further, it expressly states that the policy "is written in non-technical . . . style." Thus, there is nothing in the policy that would cause a reasonable insured to interpret *peril* as only an accidental or fortuitous force.

The exclusion's location in a long list of excluded perils, combined with the words, "caused directly or indirectly by," indicate that its intended function is to exclude a peril, not to place a limit on replacement costs. (See *Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1265.) Thus, an insured might reasonably construe the exclusion as referring to such perils as the forced demolition or repair of a dilapidated, encroaching, or nonconforming building or part of a building, by civil authorities.

" '[A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again "any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." [Citation.] Thus, "the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language." [Citation.] The exclusionary clause "must be *conspicuous, plain and clear.*" ' [Citation.] This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded. [Citation.]" (*MacKinnon v. Truck Ins. Exchange, supra,* 31 Cal.4th at p. 648.)

Petitioners contend that, even without an exclusion, the guaranteed replacement cost coverage of the Protector Plus policy cannot reasonably be interpreted as including an allowance for increased costs of repair due to changes in the building codes, because replacement cost is limited to "equivalent construction and use." Petitioners reason that "equivalent construction" means a building of substantially identical design and material as the original building, and therefore, a building that may not meet the requirements of the current building codes.

We note that petitioners' interpretation ignores the word *use.* The Protector Plus policy provides replacement cost coverage not only for equivalent construction, but also for the *equivalent use* on the same premises, or "the amount actually and necessarily spent to repair or replace the building intended for the *same occupancy and use.*" (Italics added.)

Without giving any weight to the word "use," the "equivalent construction" coverage as petitioners interpret it, would provide only the cost to *reproduce* an older residence. As one court has explained: "Reproduction cost is the estimated cost to construct, at current prices, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship, and embodying all the deficiencies, superadequacies,[14] and *obsolescence of the subject building.* [¶] Replacement cost is the estimated cost to construct, at current prices, a building with *utility equivalent* to the building being appraised, using modern materials and current standards, design, and layout. [Citation.]" (*Dupre, supra,* 62 P.3d at p. 1031, italics added; see also Black's Law Dict. (7th ed. 1999) p. 349 ["replacement cost. The cost of acquiring an asset that is as equally useful or productive as an asset currently held."]; 12 Couch on Insurance (3d ed. 2003) §176:66.)

 What the *Dupre* court terms, "reproduction," is the same as *replacement cost less depreciation,* which is, in turn, the test for *actual cash value* in some jurisdictions. (See *McAnarney v. Newark Fire Ins. Co.* (1928) 247 N.Y. 176, 182–184 [159 N.E. 902].) In California, actual cash value is the fair market value of a structure at the time it is destroyed. (*Jefferson Ins. Co. v. Superior Court, supra,* 3 Cal.3d at p. 402.) As we have previously discussed, the California meaning of actual cash value is reflected in the language of the insuring clause of the standard form set forth in section 2071: the "cost to repair or replace the property with material of like kind and quality within a reasonable time after the loss, without allowance for any increased cost of repair or reconstruction by reason of any ordinance or law regulating construction or repair."

Thus, petitioners' reasoning would lead inevitably to an interpretation of *equivalent construction and use* as coverage for only actual cash value. A reasonable insured would hardly expect guaranteed replacement cost coverage to provide no greater protection than actual cash value coverage. Indeed, the Protector Plus policy makes a distinction between "replacement cost" and "actual cash value." The policy will pay only the "actual cash value" until repair or replacement is completed, or if the insured does not rebuild. Once the repair or replacement is completed, the insured "may make a claim for any *additional amount* on a replacement cost basis if the property has been repaired or replaced." (Italics added.)

The first amended complaint alleges that real parties repaired or rebuilt their homes, and otherwise complied with the conditions of the policy, except

---

[14] The word "superadequacies," is apparently real estate appraisers' jargon for special design features that add to the cost of reproduction, but not to market value. (See *Breault v. Town of Jericho* (1991) 155 Vt. 565, 570 [586 A.2d 1153].)

as may have been prevented by the defendants. They are therefore not limited to "actual cash value." No reasonable insured would expect "equivalent construction and use" to mean that there would *never* be an additional amount paid after payment of the actual cash value, even after they repaired or rebuilt; and yet that is what petitioners, in essence, propose. We conclude that an insured may reasonably expect "equivalent construction and use" to mean a home of substantially similar construction that is the functional equivalent of the home lost.

Such an expectation is supported by the Protection Plus policy's Value Protection Clause, which provides for annual increases to policy limits "to reflect changes in costs of construction." The purpose of a value protection clause is to cover the increased value of the insured's property, and to allow the insurer to adjust premiums accordingly, thereby protecting both the insured and the insurer. (See *Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110, 1114–1115 [55 Cal.Rptr.2d 276].)

Petitioners contend that the value protection clause cannot reasonably be interpreted as relating to additional costs for upgrades required by the building code, because it is located in the "Conditions" section of the policy. The "Conditions" section, petitioners reason, is not where one would expect to find additional coverage to overcome an express exclusion. Thus, petitioners contend, the only reasonable interpretation is that it provides only inflation protection.

Since we have already found the ordinance-or-law exclusion to be ambiguous, and that it does not contain the words, "increased costs" or "upgrades," we cannot agree that there is an *express* exclusion of coverage for increased costs of required upgrades. If the Protector Plus policy has not excluded such costs, it stands to reason that the insurer will need to adjust policy limits and premiums on a regular basis, and that the insurer would make its right to do so a condition of coverage. Thus, it is not illogical to find the insurer's right to do so under *conditions*.

Although the word, "inflation," is not used or defined in the policy, we agree that a reasonable insured would expect to be protected from inflation. Thus, for example, petitioners would probably agree that the insured should reasonably expect to be reimbursed for the increased costs of construction if the price of nails goes up. Under petitioners' construction, however, there would be no payment for "replacement cost" if the value of the dollar holds steady, but construction costs in general are inflated because the building code now requires more nails.

We would not expect a reasonable insured to make such a finely nuanced distinction, even if construction costs rise due to the requirement of materials

more expensive than nails. An insured might reasonably expect the insurer to take such community-wide increases in costs of construction into account when it increases premiums under the value protection clause.

One commentator has interpreted the purpose of value protection clauses as providing the increased cost of upgrades required by the building codes, and as the equivalent of an endorsement to overcome an exclusion of such increased costs, if there is one. (See e.g., Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 6:287.6, p. 6B-40.) We conclude that it would be reasonable for an insured to do the same.

Petitioners have failed to demonstrate that their interpretations of the ordinance-or-law exclusion, the guaranteed replacement cost coverage, and the value protection clause are the only reasonable interpretations, and we must, therefore, resolve any doubt in favor of coverage. (*MacKinnon v. Truck Ins. Exchange, supra,* 31 Cal.4th at p. 655; *Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1264; *AIU Ins. Co. v. Superior Court, supra,* 51 Cal.3d at pp. 821–822.)

■ We conclude that the Protector Plus policy is ambiguous, and that an insured might reasonably expect coverage for the costs of a replacement home of substantially similar construction that is the functional equivalent of the home lost or the portion of the home destroyed, even if changes in the building codes result in a higher loss settlement than the "cost to repair or replace the property with material of like kind and quality within a reasonable time after the loss, without allowance for any increased cost of repair or reconstruction by reason of any ordinance or law regulating construction or repair" as provided in section 2071.

## DISPOSITION

The petition for writ of mandate is granted only with regard to the finding of coverage for the cost to restore, replace, repair or rebuild land. The petition is denied with regard to the issue of increased costs due to changes in building codes. Let a writ issue directing the superior court to vacate only that part of its order based upon coverage for the cost to restore, replace, repair or rebuild land, and to enter a new order, finding that no cause of action is stated based upon the cost to restore, replace, repair or rebuild land. Each party shall bear its own costs.

Epstein, Acting P. J., and Curry, J., concurred.

A petition for a rehearing was denied March 23, 2004, and petitioners' petition for review by the Supreme Court was denied June 16, 2004.