[Nos. D012261, D012748. Fourth Dist., Div. One. Nov. 22, 1991.]

STEPHEN W. BISCHEL, Plaintiff and Respondent, v.
FIRE INSURANCE EXCHANGE, Defendant and Appellant.

## COUNSEL

Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone, Horvitz & Levy, Barry R. Levy, William C. Hernquist II and Lisa Perrochet for Defendant and Appellant.

Sullivan, Hill, Lewin & Markham, Sullivan, Lewin & Markham, Donald G. Rez and Michael A. La Bazzo for Plaintiff and Respondent.

## OPINION

**TODD, J.**—Stephen Bischel sued Fire Insurance Exchange (Exchange) for breach of cont act and insurance bad faith stemming from a claim under his homeowners insurance policy for damage to the boat dock adjacent to his home. Exchange paid policy benefits to rebuild the dock to its preloss condition, but refused to pay additional benefits to rebuild the dock to upgraded municipal code standards. The trial court, sitting without a jury, ruled in favor of Bischel on the contract claim, concluding Exchange should have paid to demolish and rebuild the dock to the new code standards. The trial court also held Exchange owed Bischel $21,000 in costs and attorney fees as bad faith damages and $25,000 in punitive damages. Exchange appeals.

### FACTS

In 1985, Bischel purchased a house in the Coronado Cays and added a boat dock to the property. He contacted Duane Anderson to obtain homeowner's insurance coverage for his home and dock. Agent Tom Flynn took over the account in 1986. When Bischel contacted Flynn and asked if the amount of coverage on the dock—$59,000—was adequate, Flynn said it was.

In July 1988, Bischel noticed damage to the inside part of the dock. He contacted the company that had installed the dock, and after an examination

of the damage, an individual from the company speculated the damage might have been caused by a storm the previous January. Bischel then reported the loss to Exchange and passed on the speculation that the damage was caused by the storm. Claims investigator Diane Duffey visited Bischel's property on July 14, 1988. She took photographs and interviewed Bischel. Later, Exchange sent a marine surveyor, Captain Kenneth Frank, to investigate the damage. Without contacting Bischel, Frank examined the damage to the dock by jumping a fence to get onto the property. On September 8, Frank reported to Exchange that it appeared a storm caused the damage. Claims supervisor Steven Lingley reviewed the claims file and decided to deny Bischel's claim on September 9 or 10 based on the water damage exclusion, which barred coverage for losses from wave action. A denial letter was sent to Bischel on September 14, 1988.

On November 1, 1988, Bischel's counsel sent a letter to Exchange explaining that new information had become available that a 48-foot boat owned by Frank Domingues was tied to Bischel's dock during the previous January storm. Exchange then investigated the claim further, but denied the claim again based on the water damage exclusion. Exchange so informed Bischel by a November 7, 1988, letter. This lawsuit was filed on December 15, 1988.

Subsequent to the filing of the lawsuit,[1] Domingues told Bischel that when his boat was tied up to Bischel's dock in July 1988, he attempted to cast off from the dock without releasing the port bow line securing the boat to the northern shoreside walkway. As he started to pull away, Domingues felt the boat lurch and hit the side of the dock. Domingues jumped to the dock and noticed hairline cracks, but did not mention it to Bischel. After learning of Domingues's role, Bischel contacted Exchange, which undertook to investigate the claim again. Exchange extended coverage, offering to pay the amount indicated in estimates for returning the dock to its preloss condition. Exchange ultimately paid $13,366.44.

In June 1989, Bischel learned the City of Coronado had enacted new standards for dock construction that would affect the repair of the dock. The cost of replacing the dock pursuant to the new standards was $49,885. Exchange declined to pay for the additional repairs required by the upgraded standards. On December 12, 1989, Bischel filed a first amended complaint against Exchange and Domingues, seeking damages to bring the entire dock

[1]Bischel testified that in two or three conversations with Domingues after July 1988, Domingues did not admit damaging the dock. Not until December, after the damage had worsened and Bischel explained to him that it was serious, did Domingues admit he might be responsible for the damage.

up to the new code standards. Before trial, Bischel settled with Domingues for $22,000.[2]

DISCUSSION

I

Bischel contends the appeal should be dismissed on the basis that Exchange has waived or forfeited any appeal rights based on a policy provision that it would pay loss payments within 60 days of a court judgment. The contention is without merit.

Bischel stretches credulity to its breaking point in insisting that because the policy provision does not state payment shall be made upon a final judgment, Exchange has agreed to treat all trial court judgments as nonappealable. Bischel's argument ignores Code of Civil Procedure section 904.1, subdivision (a), which provides Exchange with the right to appeal the judgment.[3] While the right to appeal may be waived by agreement (*Estate of Hart* (1962) 204 Cal.App.2d 634, 637 [22 Cal.Rptr. 495]), any such waiver should be clear and express (*Keroff* v. *Snyder* (1962) 208 Cal.App.2d 429, 431-432 [25 Cal.Rptr. 234]; see also *Reisman* v. *Shahverdian* (1984) 153 Cal.App.3d 1074, 1088 [201 Cal.Rptr. 194]). As the court stated in *Estate of Hart, supra,* 204 Cal.App.2d at page 637: "[T]here may be some doubt as to the intentions of appellant, and since *a right to appeal is basic* we prefer to resolve the doubt in favor of appellant's right to appeal." (Italics added.) Moreover, Bischel's argument would transform a provision entitled "Loss Payment" into a forfeiture of appeal rights even though the concept of appeal is nowhere discussed, let alone mentioned, in the provision. From the language of the provision, it is clear that the provision is merely a 60-day payment provision. Bischel would have us read an ambiguity into the provision to force the application of the rule that ambiguous provisions in an insurance policy are to be interpreted in favor of the insured. (See, e.g., *State Farm Mut. Auto. Ins. Co.* v. *Crane* (1990) 217 Cal.App.3d 1127, 1133 [266 Cal.Rptr. 422].) However, we cannot find an ambiguity where none exists. (*Safeco Title Ins. Co.* v. *Moskopoulos* (1981) 116 Cal.App.3d 658, 665 [172 Cal.Rptr. 248, 18 A.L.R.4th 1301].) Furthermore, Bischel's attempt to analogize his interpretation of the provision to an arbitration provision also is unpersuasive. In sum, in light of the well-established right of access to judicial review, Bischel's argument that dismissal of the appeal is mandated must fail.

---

[2]Exchange also sued Domingues in a separate action and settled with him for $10,000.

[3]Exchange also has filed an appeal of the trial court's postjudgment order denying its motion to tax costs. The order is appealable as an order made after judgment. (Code Civ. Proc., § 904.1, subd. (b).) We consolidated the appeals on October 1, 1990.

## II

It is undisputed that Exchange paid policy benefits that would have restored the dock to its preloss condition. ▮ Exchange contends that it was not under any contractual obligation to do more than that, putting forth three theories to support its denial of further coverage. First, Exchange argues the cost of rebuilding the dock under the upgraded municipal standards is not included under the policy language "accidental direct physical loss" in that the added cost was an indirect rather than a direct result of the underlying loss occurrence. Second, Exchange argues loss settlement provisions of the policy require only restoration of damaged property to its preloss condition. Third, the cost of rebuilding the dock under the upgraded municipal standards is expressly excluded by the policy provision that states:

"Applying to Coverage A, B and C

"We do *not* cover direct or indirect loss from: . . . [¶] . . . Enforcement of any ordinance or law regulating construction, repair or demolition of a building or other structure . . . ."

The common thread of these three theories is the notion that the purpose of insurance is not to put the insured in a better position than he or she was before the loss but rather to compensate for the actual loss sustained.

Here, we direct our focus to the argument concerning the policy exclusion for loss from enforcement of ordinances or laws regulating construction because this was the main point litigated below.

In *Breshears* v. *Indiana Lumbermens Mut. Ins. Co.* (1967) 256 Cal.App.2d 245 [63 Cal.Rptr. 879], the plaintiff sought benefits under his replacement cost fire policy to restore his destroyed building. However, if the building were to be rebuilt in compliance with building regulations enacted after the building had originally been constructed, the cost would be significantly higher than the cost of restoration to its preloss condition. Plaintiff claimed the insurer should pay all costs of replacement, including the additional costs incurred for constructing a new building under the new code, and the trial court agreed. The Court of Appeal reversed stating that to permit recovery of costs attributable to code compliance would ignore "one of the traditional concepts of fire insurance which is to indemnify or compensate the insured for the actual loss which he has sustained and not necessarily to place him in a better position than he was in at the time of the fire . . . ." (*Breshears*, *supra*, 256 Cal.App.2d at p. 248.)

Much of the discussion in *Breshears* dealt with Insurance Code section 2071, which sets forth the California Standard Form Fire Insurance Policy.

This statutory standardized form includes language that requires the insurer to indemnify the insured for the costs of repair or replacement of property lost "without allowance for any increased cost of repair or reconstruction by reason of any ordinance or law regulating construction or repair, . . . ." (Ins. Code, § 2071.) In *Breshears*, the Court of Appeal found Insurance Code section 2071 constitutionally sound, finding the statute "affords uniform and equal protection to all building owners under the 'indemnity' concept of insurance." (256 Cal.App.2d at pp. 248-249.) The *Breshears* court went on to explain:

"The owners of new buildings which conform with state or local building laws are merely reimbursed for costs which they actually incurred. On the other hand, the owners of buildings which do not conform with such laws are not permitted to recover costs which they never assumed in the first place." (*Id.* at p. 249.)

Bischel attacked *Breshears, supra,* at the trial level as a 20-year-old case that was easily distinguishable, lacked persuasive force and whose position on this point had not been relied upon by any subsequent published decision. However, in his appellate brief, Bischel is silent on the subject of *Breshears*. We note that it is no longer possible to claim that no subsequent published decision has relied on *Breshears* for the point advanced here by Exchange. In *McCorkle* v. *State Farm Ins. Co.* (1990) 221 Cal.App.3d 610 [270 Cal.Rptr. 492], the Court of Appeal cites and relies upon *Breshears* noting that the appellate court in *Breshears* held Insurance Code section 2071 "does not require an insurer to provide the insured with a structurally more valuable building than was destroyed, even if the structural improvements are required to bring the replacement structure into compliance with changed building codes." (*McCorkle, supra,* 221 Cal.App.3d at p. 614.) In *McCorkle*, the court concluded that policy language providing for the replacement of "equivalent construction" did not cover the additional amount necessary to rebuild a garage in compliance with current building codes, and that the insurer was not required to pay only the cost of replacing the structure as it existed prior to the fire. (*Id.* at pp. 614-615.)

Bischel posits four theories why the ordinance or law exclusion in the policy is not applicable: (1) it does not apply to his coverage; (2) the City of Coronado's specifications for docks are neither laws nor ordinances; (3) the need to replace the dock is not due to enforcement activities but rather the structural integrity of the dock demands it; and (4) the exclusion does not apply when an entire structure needs to be replaced. We shall consider them seriatim.

Bischel argues since the policy specifically states the ordinance or law exclusion applies to coverage A, B and C, the exclusion does not apply to

additional coverages listed in the policy including "Guaranteed Replacement Cost Coverage—Buildings."[4] The short answer to the argument is that this additional coverage applies to buildings and the dock is not a building. The dock is covered under "Coverage B—Separate Structures" as a structure on the residence premises. The policy expressly provides the ordinance or law exclusion applies to coverage B. The longer answer to Bischel's argument is that under the language of the "Guaranteed Replacement Cost Coverage—Buildings" provision, a loss can be adjusted under the provision only if the loss is already covered under coverage A or coverage B. The ordinance or law exclusion clearly applies to coverage A and coverage B. Therefore, the ordinance or law exclusion is incorporated by reference into the "Guaranteed Replacement Cost Coverage—Buildings" provision.

Relying on Civil Code section 22[5] and Government Code section 36931 et seq., Bishel argues the specifications for docks adopted by the City of Coronado are neither laws nor ordinances and therefore the policy exclusion should not be applied to deny coverage here. While obviously, the specifications were neither enacted by the state government nor by a formal action

---

[4]Nine items are listed under the section heading Additional Coverages. Included is "8. *Guaranteed Replacement Cost Coverage—Buildings. We* will settle covered loss to buildings under Coverage A—Dwelling and Coverage B—Separate Structures at replacement cost regardless of the limits of insurance shown on the Declarations Page, subject to the following provisions: [¶] a. You have insured your dwelling and separate structures to 100% of their replacement cost as determined by our Building Replacement Cost Guide. [¶] b. You have accepted each annual adjustment in building amounts in accordance with the Value Protection Clause in the policy. [¶] c. You have notified us within 90 days of the start of any physical changes which increase the value of your insured buildings by $5,000 or more, and pay any additional premium. This includes any new structures and any additions to or remodeling of your dwelling or other structures on the *residence premises*. [¶] d. You have complied with all of the 'Loss Settlement' provisions shown in Condition 3 of Section I of the policy applicable to Coverages A and B . . . ." (Italics in original.)

The "Loss Settlement" provision reads as follows:

"*Coverage A and B*—Covered loss to buildings under Coverage A and B will be settled at replacement cost without deduction for depreciation, subject to the following:

"(1) Settlement under replacement cost will not be more than the *smallest* of the following:

"(a) the replacement cost of that part of the building damaged for equivalent construction and use on the same premises.

"(b) the amount actually and necessarily spent to repair the building intended for the same occupancy and use.

"(2) When the cost to repair or replace is *more* than $1,000 or *more* than 5% of the limit of insurance in this policy on the building, whichever is less, we shall pay no more than the *actual cash value* of the damage *until* repair or replacement is completed.

"(3) At your option, you may make a claim under this policy on an *actual cash value* basis for loss or damage to buildings. Within 180 days after loss you may make a claim for any additional amount on a replacement cost basis if the property has been repaired or replaced." (Italics in original.)

[5]Civil Code section 22 reads: "Law is a solemn expression of the will of the supreme power of the State."

of the City Council of Coronado (see Gov. Code, § 36931 et seq.), we are not persuaded by this argument based on technical language. ■ An insurance policy should be read as a layman would read it and not as it might be analyzed by an attorney or insurance expert. (*Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089].) ■ We find it highly unlikely the average lay policyholder would restrict the meanings of "law" and "ordinance" to specific sections of the Civil Code and Government Code.

Thus, it is appropriate to examine the permit process and building requirements adopted by the City of Coronado. The City of Coronado has enacted the following pertinent ordinances. The Municipal Code, section 2.04.10 provides:

"[I]t shall be the duty of the city manager to enforce all laws and ordinances of the city and to see that all franchises, contracts, permits and privileges granted by the city council are faithfully observed." City ordinances 1625 and 1626 authorized the city engineer to control all work within a public right of way. Under title 14 of the Municipal Code, chapter 14.01.030, the city engineer has the duty to:

"[A]dminister and enforce provisions of this Title pertaining to public improvements . . . [a]nd in discharging this responsibility the city engineer shall . . . determine the extent, type and requirements of the work to be done [and] issue permits for work when all applicable conditions established for such permits have been met . . . ."

As a result of these ordinances and in compliance with them, the city engineer issued "Standard Specifications for Boat Slips, Docks, . . ." which went into effect on July 26, 1987. The specifications patently are regulations adopted by the City of Coronado in accordance with its municipal code. We have no doubt the average lay policyholder would consider them as laws. Webster's Third New International Dictionary defines "law" as:

"[A] binding custom or practice of a community: a rule or mode of conduct or action that is prescribed or formally recognized as binding by a supreme controlling authority or is made obligatory by a sanction (as an edict, decree, rescript, order, ordinance, statute, resolution, rule, judicial decision, or usage) made, recognized or enforced by the controlling authority."

Similarly, Black's Law Dictionary provides the following definition: "Law, in its generic sense, is a body of rules of action or conduct prescribed by controlling authority, and having binding legal force." (Black's Law Dict. (6th ed. 1990) p. 884, col. 2.)

Because Insurance Code section 2071 authorizes use of an ordinance or law exclusion, we find ordinary rules of construction against the insurer are not applicable with respect to this provision. ■ As the Supreme Court observed recently in *Prudential-LMI Com. Insurance* v. *Superior Court* (1990) 51 Cal.3d 674, 684 [274 Cal.Rptr. 387, 798 P.2d 1230]:

"When a clause in an insurance policy is authorized by statute, it is deemed consistent with public policy as established by the Legislature. [Citation.] In addition, the statute must be construed to implement the intent of the Legislature and should not be construed strictly against the insurer (unlike ambiguous or uncertain policy language). [Citations.]"

■ The trial court held the permit process and building standards were an ordinance. However, the trial court found the policy exclusion with its language of *enforcement* of any ordinance or law did not apply. The trial court said:

"[T]he City's withholding of a permit which does not comply with the 1987 'Engineering Specifications' is not 'enforcement' of the ordinance within the meaning of the exclusion. [¶] Because of failures of other similar docks in the Cays area, the City undertook to set sound engineering standards for future construction. Withholding of a permit until compliance with sound engineering standards is not 'enforcement' in the normal sense of the word. The withholding simply resulted in protection of other properties, boats, docks, and persons in the Cays area. No affirmative action was undertaken by City officials, nor was any object disturbed or removed, nor any person sanctioned. The withholding was simply inaction which frustrated the plaintiff in having his dock repaired or replaced. The insurer's construction of the policy and its position with respect thereto constituted a frustration of purposes and, therefore, a breach of contract."

Implicit in the trial court's ruling is the notion that enforcement of a law must include affirmative action of some sort. This is incorrect. ■ "Enforcement" is the "carrying out of a mandate or a command." (Black's Law Dict. (6th ed. 1990) p. 528, col. 2.) ■ Implementing building standards and withholding permits for construction in violation of those standards is how the city carries out the mandate or command of the municipal code provisions discussed above. Had the city not enforced the provisions of the code, Bischel could have rebuilt his dock to its preloss condition. He admitted as much in his first amended complaint when he stated:

"Because of standards for dock construction imposed by the City of Coronado, adopted on July 26, 1987, the portion of plaintiff's dock which was damaged by Domingues cannot be repaired without also bringing the

entire dock up to code." The trial court's finding that enforcement was not present is without basis.

Relying on the testimony of his expert engineer witness that the dock must be replaced to assure its structural integrity, Bischel next argues the policy exclusion should not be involved because the need to replace the dock is not a result of the permit process but rather a result of the damage done to the dock. This argument ignores the important allegation in his complaint, quoted immediately above, that because of standards for dock construction imposed by the city, the portion of Bischel's dock which was damaged by Domingues cannot be repaired without also bringing the entire dock up to code. It also ignores a stipulation contained in the joint disposition conference report: "Absent the City of Coronado specifications, defendant Fire Insurance Exchange has paid sums sufficient to repair the dock to its previous condition."

Finally, relying on out-of-state cases, Bischel argues the ordinance or law exclusion does not apply when the ordinance would require the entire structure to be replaced. Although Bischel's broad interpretation of the constructive total loss limitation is supported by a number of out-of-state authorities (*Feinbloom* v. *Camden Fire Ins. Ass'n* (1959) 54 N.J. Super. 541 [149 A.2d 616]; *Hertog* v. *Milwaukee Mut. Ins. Co.* (Minn. Ct. App. 1987) [415 N.W.2d 370]; *Fidelity & Guar. Ins.* v. *Allied Realty* (1989) 238 Va. 458 [384 S.E.2d 613]), it has not been accepted by California cases. Instead, cases such as *Breshears, supra,* 256 Cal.App.2d 245, and *McCorkle, supra,* 221 Cal.App.3d 610, hold that the cost of construction upgrades required by ordinances or laws must be borne by the property owner rather than the insurer.

For all of the above reasons, we conclude the ordinance or law exclusion contained in the policy properly should have foreclosed further coverage here. In light of this conclusion, it is unnecessary to discuss Exchange's other theories of noncoverage and its other assignments of error.[6] Since Exchange has already paid the amount properly due under the policy, it is entitled to judgment.

---

[6]Exchange also has assigned error to (1) the amount of contract damages as either too uncertain or constituting double recovery, (2) the award of bad faith damages and (3) the amount of punitive damages.

## DISPOSITION

Judgment reversed. The trial court is directed to enter judgment for Exchange.

Kremer, P. J., and Benke, J., concurred.

Respondent's petition for review by the Supreme Court was denied March 19, 1992. Mosk, J., Kennard, J., and George, J., were of the opinion that the petition should be granted.