**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SIERRA PACIFIC POWER COMPANY, *Plaintiff-Appellant,* v. HARTFORD STEAM BOILER INSPECTION & INSURANCE CO.; ZURICH AMERICAN INSURANCE COMPANY, *Defendants-Appellees.* | No. 09-16662 D.C. No. 3:04-cv-00034-LRH-RAM District of Nevada, Reno |
| SIERRA PACIFIC POWER COMPANY, *Plaintiff-Appellee,* v. HARTFORD STEAM BOILER INSPECTION & INSURANCE CO.; ZURICH AMERICAN INSURANCE COMPANY, *Defendants-Appellants.* | No. 09-16802 D.C. No. 3:04-cv-00034-LRH-RAM District of Nevada, Reno ORDER CERTIFYING QUESTIONS TO CALIFORNIA SUPREME COURT |

Filed January 5, 2012

Before: Ronald M. Gould and Consuelo M. Callahan,
Circuit Judges, and Edward R. Korman,
Senior District Judge.*

*The Honorable Edward R. Korman, Senior District Judge for the U.S.
District Court for Eastern New York, sitting by designation.

## COUNSEL

For plaintiff-appellant/cross-appellee Sierra Pacific Power Co.: William E. Peterson, of Reno, Nevada.

For defendants-appellees/cross-appellants Hartford Steam Boiler Inspection & Ins. Co., et al., David E. Bland, of Minneapolis, Minnesota.

## ORDER

On New Year's Day, 1997, the Truckee River in the Sierra Nevada Mountains flooded. The flood destroyed the Farad Dam, which was owned by plaintiff Sierra Pacific Power Co. ("Sierra"), and used in connection with its hydroelectric facility in Farad, California. Insurers Hartford Steam Boiler Inspection & Insurance Co. ("Hartford") and Zurich American Insurance Co. ("Zurich") (together "Insurers") insured Sierra's facilities, including the Farad Dam, with $200 million in total coverage.

In this coverage dispute, a primary issue is whether, as a matter of California insurance law, the building ordinance or law exclusion excludes increased costs of replacement due to building ordinances following a loss caused by a covered peril. If it does exclude such costs, a secondary issue is whether, again as a matter of California insurance law, other costs that are prerequisites to building, such as costs of obtaining permits and environmental impact studies, are excluded by the building ordinance or law exclusion. The California Supreme Court has not ruled on these questions, and the California Courts of Appeal have reached conflicting conclusions. As these questions are dispositive of a primary issue in this appeal, we respectfully request that the California Supreme Court exercise its discretion and decide the certified questions presented below.

## I. Questions Presented

Pursuant to Rule 8.548 of the California Rules of Court, we request that the California Supreme Court answer the following questions:

1. Whether, under California insurance law, a building ordinance or law exclusion, found in the Perils Exclusions section of a property insurance policy, effectively excludes coverage for increased costs caused by complying with ordinances and regulations if the underlying loss was caused by a covered peril.

2. Whether, under California insurance law, the costs of obtaining building permits or conducting required environmental impact studies are considered costs excluded by a building ordinance or law exclusion, or whether these costs are better considered as part of the replacement cost under the policy.

The phrasing of the questions set forth above should not restrict the California Supreme Court's consideration of the issues involved, and we understand that the court may reformulate our questions. Cal. R. Ct. 8.548(f)(5). We will accept the decision of the California Supreme Court. Cal. R. Ct. 8.548(b)(2); *Hayes v. Cnty. of San Diego*, 658 F.3d 867, 868 (9th Cir. 2011). There is no controlling precedent to these questions because there is no California Supreme Court decision relevant to the issue, and the California Courts of Appeal appear to be divided. *See* Cal. R. Ct. 8.548(a)(2). The California Supreme Court's decision on these questions of California law will determine the outcome of the primary issue in this appeal. Cal. R. Ct. 8.548(a).

## II.   Factual and Procedural Background

### A.   The Dam and the Insurance Policies

Sierra is a publicly traded, investor-owned public utility engaged in the sale, distribution, transmission, and generation of electrical energy and natural gas. Sierra's public service territory includes most of Northern Nevada and parts of Eastern California. Sierra is both a California public utility and a Nevada public utility and its businesses are regulated by the California Public Utilities Commission and the Public Service Commission of Nevada.

For many years prior to 1997, Sierra operated the Farad Dam, a hydroelectric dam on the Truckee River just west of the California-Nevada border. The Farad Dam consisted of nearly two miles of wooden flume, a forebay, a diversion dam, and a power generating facility with related structures, substation and transmission lines. On January 1, 1997, the Truckee River flooded, destroying the Farad Dam. Sierra insured the Farad Dam, along with the rest of its facilities, using two identical insurance policies, one issued by Hartford and one by Zurich (hereinafter, the "Policy"). The Farad Dam is covered property under the Policy, and flood is a covered peril.

The "policy insures against all risks of direct physical loss or damage to the property insured from perils not otherwise excluded, subject to the terms and conditions" contained in the Policy. The Policy is divided into three sections. Section A contains coverage for property, Section B contains coverage for boilers and machinery, and Section C contains general provisions applicable to both. Section A also contains its own exclusions section for both excluded property and perils. This section does not contain an exclusion for increased cost of construction due to changes in building ordinances.

Section C also includes a section containing perils exclusions. The particular exclusion at issue here regarding build-

ing ordinances or laws is contained in this section (hereinafter the "Building Ordinance Exclusion"), and states:

### IV.  PERILS EXCLUDED

This policy does not insure against loss or damage caused by or resulting from:

\*\*\*

E.  any increase in the loss due to any ordinance, law or regulation, rule or ruling restricting or affecting repair, alteration, use, operation, construction or installation; or by any injunction or process of any court, unless endorsed hereon.

The Policy is a replacement cost policy covering the full cost of repair or replacement of covered property for covered losses subject to the limits and sublimits of the Policy. However, recovery for property not repaired or replaced is limited to the actual cash value ("ACV") of the property. This limitation is described in the valuation provision within Section C, also at issue here, which states:

### W.  Valuation

Unless otherwise endorsed hereon, adjustment of the loss under this policy shall be:

\*\*\*

6.  on all other property covered by this policy the cost of repair or replacement (defined as the cost to repair or replace the damaged property without deduction for depreciation with materials of

like kind, size, capacity and quality) subject to:

a. liability under these terms shall not exceed the smallest of the following:

   (1) the cost to repair, rebuild or replace on the same site with material of like kind, size, capacity and quality, whichever is smallest;

   (2) the actual expenditure incurred in repairing, rebuilding or replacing on the same or another site but not to exceed size and operating capacity that existed at the time of loss, whichever is smallest.

b. in the event of loss or damage to property which is not repaired, rebuilt or replaced within two years from the date of loss or damage, this company shall not be liable for more than the actual cash value (with proper deduction for depreciation) of the property destroyed;

all to be computed as of the time and at the place of loss when with diligence and dispatch rebuilding, repairing or replacement of the damaged or destroyed property could be effected.

ACV is not otherwise defined in the policy.

The final provision at issue here is found in the Extensions of Coverage section of Section C. Specifically, the Policy provides:

### I. Demolition and Increased Cost of Construction

1. If at the time of any direct physical loss or damage insured against by this policy there is in force any ordinance regulating the construction, repair, replacement or use of buildings or structures, then this policy is extended to cover:

   a. the additional loss sustained in demolishing any undamaged portion of the buildings or structures necessitated by such law or ordinance;

   b. the cost incurred in actually rebuilding both the damaged and demolished portions of such buildings or structures in a manner to satisfy such law or ordinance.

The Demolition and Increased Cost of Construction ("DICC") coverage provided by this extension is limited to $10 million through a specific sublimit in the declarations pages of the policy.

### B. Sierra's Claim for Insurance Coverage

Sierra made a claim with the Insurers for the replacement of the Farad Dam following the flood. In July, 1998, Sierra obtained a preliminary estimate for the replacement cost of the dam. The parties dispute the effect of this estimate. Sierra claims that the estimate was an "obviously unreliable, admittedly inaccurate and superseded" estimate, and the Insurers claim that the number represented an agreement between them and Sierra as to the cost to replace the dam as it existed prior to the flood. Sierra also notes that this estimate was pre-

pared without the benefit of design drawings or actual contractor bids for any required work.

When Sierra obtained the estimate to replace the dam in July of 1998, it believed it would not need to comply with detailed requirements for environmental impact studies under the California Environmental Quality Act ("CEQA"). However, the California State Water Resources Control Board ("CSWRCB") eventually did require detailed environmental impact studies, which resulted in design changes of the dam and even required moving the location. Numerous permits and easements were required to comply with these requirements. The costs associated with completing these studies, obtaining permits and easements, and design changes necessitated by the regulatory agencies were not included in the initial estimate to replace the dam.

Sierra could not begin construction of the dam without the required permits, which it could not obtain until the CSWRCB issued its approval of Sierra's plans to rebuild the dam, which it finally did on June 25, 2003. Sierra finally obtained the requisite environmental permit from the CSWRCB in March of 2004, but was not able to obtain a permit from the California Transportation Commission until sometime in 2005.

Meanwhile, in 2001, Sierra obtained bids and estimates to actually replace the dam. The amount to rebuild the dam was estimated to be $16,205,303. After the trial, the district court made a factual finding that the actual estimated cost to replace the dam was $19,800,000. The Insurers have not disputed that the actual estimated replacement cost of the Farad Dam is $19,800,000.

## C.   The District Court Proceedings

The case was tried at a bench trial beginning April 8, 2008. The court issued its Findings of Fact and Conclusions of Law on September 30, 2008, which include:

> The Policy form provides for an exclusion for recovery of costs of increased costs of construction resulting from the Peril of new law or ordinance, but otherwise has no exclusion for increased costs of construction resulting from covered losses.
>
> The evidence established that the actual estimated cost to replace Farad [Dam] is $19,800,000.
>
> Sierra incurred costs and expenses to rebuild and replace Farad Dam. These costs consisted of expenditures made to remove debris, test soils, design the dam, prepare construction plans and drawings, and to procure the numerous licenses and permits necessary to replace the dam. The costs exceeded $4,000,000.
>
> The available replacement cost coverage of the dam includes design fees, permitting fees and other regulatory costs necessary to rebuild the dam.
>
> The coverage available to Sierra included increased costs of construction based on intervening changes in the law.
>
> The actual cash value (with proper deduction for depreciation) of the Farad Dam is $1,261,200.

The district court also found that the parties had not reached an agreement on the ACV of the dam at the time of loss. The district court had previously ruled that the ACV of the dam should be calculated based upon replacement cost of the dam less depreciation, and this ruling was confirmed in the court's order following trial.[1] Sierra timely filed its notice of appeal and the Insurers timely filed a notice of cross-appeal.

---

[1]The district court initially ruled that Nevada law should apply to the insurance coverage questions at issue. Following the bench trial, the court

## III.   Basis for Certification

The parties agree that if Sierra timely replaces the dam it is entitled to replacement cost of the dam. Alternatively, if it does not replace the dam, there is no question that it is entitled to the ACV of the dam, which the district court correctly determined to be calculated as replacement cost less depreciation.[2] Thus, to determine ACV, it is necessary to first determine the replacement cost of the dam. Similarly, if Sierra does replace the dam within the time allowed by the policy, it is entitled to at least the ACV of the dam until it has completed replacement, at which time it will be entitled to the remaining portion of the replacement cost (which should amount to the depreciation).

---

indicated it "would have some reason to reconsider its ruling" regarding choice of law, but stated it did not believe there was a difference between Nevada and California law at issue. We find that based upon Nevada's choice of law provisions, California law applies to the dispute, primarily because the dam was located in California. *See Williams v. United Servs. Auto. Ass'n*, 849 P.2d 265, 266-67 (Nev. 1993).

[2]We recognize that in California, ACV is deemed to be fair market value, or "the price that a willing buyer would pay a willing seller, neither being under any compulsion to sell or buy." *Cheeks v. Cal. Fair Plan Ass'n*, 71 Cal. Rptr. 2d 568, 571 (Cal. Ct. App. 1998) (quoting *Jefferson Ins. Co. v. Super. Ct.*, 3 Cal. 3d at 402). However, where the property to be replaced has no sales market, such as the Farad Dam, California Courts have sanctioned the use of replacement cost less depreciation as an acceptable method for determining ACV. *Id.* at 572 n.5. *Cheeks* is particularly instructive as it suggests wording for insurers to use to dictate replacement cost less depreciation as a measure of ACV, and the instant policy contains that language. *Id.* ("If [Insurers] want to determine 'actual cash value' on the basis of replacement cost less depreciation all [they] ha[ve] to do is say so in the policy . . . . This can be accomplished by using words such as *'actual cash value, with proper deduction for depreciation.'* " *Id.* (quoting *Hughes v. Potomac Ins. Co.*, 18 Cal. Rptr. 650, 658 (Cal. Ct. App. 1962)) (emphasis added)). Since the Policy uses these precise words, the ACV should be determined as replacement cost less depreciation of the dam.

A primary issue in this appeal is whether the replacement cost should include increased costs due to complying with ordinances affecting the construction. This is an important question in California, as virtually all multi-peril property insurance policies contain exclusions similar to the Building Ordinance Exclusion at issue here. The second question, applicable only if the increased costs are effectively excluded by the Building Ordinance Exclusion, is whether costs for complying with regulatory agency required environmental impact studies are considered costs excluded by this exclusion.

## A.  Building Ordinance Exclusion

### 1.  Relevant Case Law

The California Supreme Court has not addressed the question whether a building ordinance or law exclusion contained in a section of perils exclusions, similar to the one at issue here, is effective to limit the coverage for an insured structure by excluding costs for complying with intervening building code changes. Jurisdictions that have addressed this question have reached differing conclusions.[3] The California Courts of Appeal appear to be split on the issue as well. The most recent decision, *Fire Insurance Exchange v. Superior Court (Altman)*, 10 Cal. Rptr. 3d 617, 631 (Cal. Ct. App. 2004) ("*Fire Insurance Exchange*"), found that a similar exclusion does not exclude costs to comply with building codes when the loss

---

[3]*Compare Dupre v. Allstate Ins. Co.*, 62 P.3d 1024, 1029-30 (Colo. App. 2002), *Bering Strait School Dist. v. RLI Ins.*, 873 P.2d 1292, 1296 (Alaska 1994), *Farmers Union Mut. Ins. Co. v. Oakland*, 825 P.2d 554 (Mont. 1992), *and Garnett v. Transamerica Ins. Servs.*, 800 P.2d 656 (Idaho 1990) (interpreting similar language and holding perils exclusions do not operate to exclude increased costs to replace due to intervening changes in building ordinances), *with Spears v. Shelter Mut. Ins. Co.*, 73 P.3d 865, 867-69 (Okla. 2003), *and Dombrowsky v. Farmers Ins. Co. of Wash.*, 928 P.2d 1127 (Wash. Ct. App. 1996) (finding exclusion does limit coverage).

itself is caused by a covered peril. Earlier decisions, most notably *Bischel v. Fire Insurance Exchange*, 2 Cal. Rptr. 2d 575, 581 (Cal. Ct. App. 1991), found that the exclusion did preclude coverage. The California Supreme Court denied review in both cases.

In *Fire Insurance Exchange*, the court emphasized that the exclusion for losses caused by enforcement of building codes or ordinances was in a section containing only perils exclusions. Moreover, there was no limiting language in the valuation section of the policy or insuring clause, but by comparison there is such limiting language in the standard form policy in California Insurance Code Section 2071.[4] *Fire Ins. Exch.*, 10 Cal. Rptr. 3d at 632. The court stated, "[t]he exclusion's location in a long list of excluded perils, combined with the words 'caused directly or indirectly by,' indicate that its intended function is to exclude a peril, not to place a limit on replacement costs." *Id.* at 634 (citing *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1265 (1992)).

In addition, the court noted that "increased costs are not a peril, [and] nowhere does the exclusion use the term, 'increased costs.' It excludes loss caused by or consisting of *enforcement*, which is not a cost, and which appears in a list of perils." *Id.* at 633 (emphasis original). California courts hold that "direct physical loss 'contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.' " *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 115 Cal. Rptr. 3d

---

[4]The standard form policy need not be used where the policy provides coverage more favorable to the insured than the standard form. Like the policy in *Fire Insurance Exchange*, and indeed like most property policies in California, the Policy at issue here provides multi-peril coverage on a replacement cost basis, which is more favorable to the insured than the standard form's actual cash value coverage for the peril of fire. Thus, the standard form does not control.

27, 37 (Cal. Ct. App. 2010) (quoting *AFLAC, Inc. v. Chubb & Sons, Inc.* 581 S.E. 2d 317, 319 (Ga. Ct. App. 2003)). Thus, "loss" and "costs" are distinct concepts.

Other California cases have reviewed similar exclusions and reached different conclusions. *Bischel* relied on two previous cases dealing with actual cash value policies, *Breshears v. Ind. Lumbermens Mut. Ins. Co.* 63 Cal. Rptr. 879 (Cal. Ct. App. 1967) and *McCorkle v. State Farm Ins. Co.*, 270 Cal. Rptr. 492 (Cal. Ct. App. 1990), and held that the standard form policy, which governed those two cases, excluded costs from building code updates. *Bischel*, 2 Cal. Rptr. 2d at 580. *Bischel* relied on the fact that California Insurance Code Section 2071 "authorizes use of an ordinance or law exclusion[ to] find ordinary rules of construction against the insurer are not applicable with respect to this provision." *Id.*

Since the policy at issue in *Fire Insurance Exchange* was a replacement cost policy, that court concluded that *Bischel*, *Breshears*, and *McCorkle* did not dictate that the increased costs should be excluded. 10 Cal. Rptr. 3d at 631. *Fire Insurance Exchange* further criticized the *Bischel* court for not discussing the effect of the difference between actual cash value policies and replacement cost policies since *Bischel did* involve a replacement cost policy. *Id.* at 631-32. *Fire Insurance Exchange* "conclude[d] that *Bischel* is an anomaly, and [noted] that its reasoning has not been followed in any published California judicial opinion." *Id.* at 632. While *Bischel* has not been followed since *Fire Insurance Exchange*, it has not been overturned. Thus, we are unable to predict how the California Supreme Court would decide the issue.

### 2.  *The DICC Coverage Extension*

The Insurers contend that any coverage for increased costs due to intervening changes in building codes or ordinances is limited to that offered in the Demolition and Increased Cost of Construction coverage extension. However, even though

this coverage extension would cover the extra expense incurred as a result of complying with intervening changes in building ordinances, it does not *limit* coverage otherwise available under the Policy. This coverage extension gives additional coverage not available elsewhere under the Policy for demolishing undamaged portions of the building or structure if required by new building ordinances. Thus, this extension of coverage cannot limit liability under the Policy.

### 3. Conclusion

If the Policy excludes increased costs due to building ordinances, the Building Ordinance Exclusion is the only potential source of that limitation. The California Supreme Court has not indicated whether such an exclusion, which is located in a list of perils exclusions and purports to exclude increases in the *loss* rather than the *costs to repair or replace*, is effective to limit an insurer's liability. The California Courts of Appeal have reached conflicting results on the issue; therefore we respectfully request the California Supreme Court decide this question of California law.

### B.  Costs in Preparation For Construction

If the Building Ordinance Exclusion is determined to exclude the increased costs due to building ordinances, the second question is whether costs such as the costs for obtaining building permits and complying with CSWRCB mandated environmental impact studies are included within the exclusion. While these costs were required by ordinances or regulations, it is unclear whether California would consider these costs, which are prerequisites to building rather than actual increased construction costs, to be within the Building Ordinance Exclusion. We have been unable to find any California case law on this issue. Because these costs are often significant — in this case the district court found them to be $4 million — we respectfully request the California Supreme Court decide this question.

## IV.   Administrative Information

If our request for certification is granted, we designate Sierra as petitioner. *See* Cal. R. Ct. 8.548(b)(1). The name and address of counsel for Sierra are William E. Peterson, Morris Peterson, 6100 Neil Road, Suite 555, Reno, NV 89511. The name and address for the Insurers are David E. Bland, Robins, Kaplan, Miller & Ciresi L.L.P., 800 LaSalle Ave., 2800 LaSalle Plaza, Minneapolis, MN 55402.

In accordance with California Rule of Court 8.548, the Clerk of this court shall file the original and ten copies of this order, along with all briefs on appeal to this court and any record materials as requested, with the California Supreme Court. The Clerk shall also file certificates of service with the parties to this appeal. Cal. R. Ct. 8.548(c), (d).

## V.   Stay of Proceedings

In light of this court's decision to certify the issues presented here, all further proceedings in this case before our court are stayed pending final action by the California Supreme Court. The parties shall notify the Clerk of this court after the California Supreme Court accepts or rejects certification, and again within fourteen days if the California Supreme Court issues a decision.

This court retains jurisdiction over any further proceedings in this case.

**IT IS SO ORDERED.**