**NOT FOR PUBLICATION**



UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| SIERRA PACIFIC POWER COMPANY, | No. 09-16662 |
| Plaintiff - Appellant, | D.C. No. 3:04-cv-00034-LRH-RAM |
| v. | |
| HARTFORD STEAM BOILER INSPECTION & INSURANCE CO.; ZURICH AMERICAN INSURANCE COMPANY, | MEMORANDUM[*] |
| Defendants - Appellees. | |

| | |
|---|---|
| SIERRA PACIFIC POWER COMPANY, | No. 09-16802 |
| Plaintiff - Appellee, | D.C. No. 3:04-cv-00034-LRH-RAM |
| v. | |
| HARTFORD STEAM BOILER INSPECTION & INSURANCE CO.; ZURICH AMERICAN INSURANCE COMPANY, | |
| Defendants - Appellants. | |

---

[*]   This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted November 2, 2010
Submission Withdrawn, November 19, 2010
Resubmitted July 25, 2012
San Francisco, California

Before: GOULD and CALLAHAN, Circuit Judges, and KORMAN, Senior District Judge.[**]

Sierra Pacific Power Co. ("Sierra") operates power generation stations in Nevada and California. Insurers Hartford Steam Boiler Inspection & Insurance Co. ("Hartford") and Zurich American Insurance Co. ("Zurich") (together "Insurers") insured Sierra's facilities, including the Farad Dam on the Truckee River in California, with $200 million in total coverage. The Farad Dam was completely destroyed by a flood in 1997, and Sierra filed a claim for the damage with the Insurers. A dispute arose over the value of the dam, and whether Sierra could recover replacement cost of the dam or only actual cash value since the dam had not yet been rebuilt. Following bench trial, the district court concluded that Sierra was entitled to the dam's actual cash value of $1,261,200, but that Sierra could recover replacement cost if the dam was actually rebuilt within three years

---

[**]     The Honorable Edward R. Korman, Senior District Judge for the U.S. District Court for Eastern New York, sitting by designation.

-2-

from the court's ruling. The court determined that the replacement cost of the dam was $19,800,000. Sierra appeals the trial court's ruling that the actual cash value ("ACV") of the dam is $1,261,200. The Insurers appeal the rulings that (1) Sierra can recover $4 million it spent so far in preparation for replacing the dam, (2) the replacement cost available to Sierra includes costs for building ordinance changes, and (3) Sierra has three years to replace the dam and still recover the replacement cost of the dam.

1.     **Choice of Laws**

The district court held that Nevada law applies to this appeal, but in a later ruling indicated it may have reason to reconsider its decision. Ultimately, the district court found no difference between California and Nevada law on the issues in dispute, and did not disturb its holding that Nevada law applies. Sierra argues that California law applies, and the Insurers argue that Nevada law applies.[1]

We review a district court's choice of law *de novo*. *Jorgensen v. Cassiday*, 320 F.3d 906, 913 (9th Cir. 2003). "A federal court sitting in diversity must apply the forum state's choice of law rules." *Id.* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). Nevada "has adopted the substantial relationship test to resolve conflict-of-law questions." *Williams v. United Servs. Auto. Ass'n*, 849 P.2d

---

[1]     We note that the Insurers argued below that California law applied.

265, 266 (Nev. 1993). The state whose law the court applies "must have a substantial relationship with the transaction; and the transaction must not violate a strong public policy of Nevada." *Id.* The factors Nevada courts use to evaluate the substantial relationship include, 1) where the contract was formed, 2) where the negotiations for the contract took place, 3) the place of performance, 4) the location of the subject matter of the contract, and 5) the residence and place of business of the parties. *Sotirakis v. United Servs. Auto. Ass'n*, 787 P.2d 788, 790 (Nev. 1990). The most significant of these factors in an insurance contract is the location of the insured risk. *Williams v. United Servs. Auto. Ass'n*, 849 P.2d at 266-67.

The most significant factor favors application of California law because the Farad Dam, the insured risk in question, was located in California. The remaining factors do not clearly favor one state or another. Therefore, we conclude California law should apply to this dispute.

2.    **Actual Cash Value of the Farad Dam**

The district court's interpretation of an insurance contract, including whether a contract term is ambiguous, is reviewed *de novo*. *Conrad v. Ace Prop. & Cas. Ins. Co.*, 532 F.3d 1000, 1004 (9th Cir. 2008). The question of what definition of actual cash value ("ACV") should be used requires interpretation of the contract,

and therefore is reviewed *de novo*. The district court's factual findings after examining extrinsic evidence and a bench trial, including the court's finding regarding the calculation of the ACV of the dam, are reviewed under the clearly erroneous standard. *DP Aviation v. Smiths Indus. Aerospace and Def. Sys., Ltd.*, 268 F.3d 829, 836 (9th Cir. 2001).

## A. Method of Calculating ACV

Under California law, ACV means fair market value ("FMV"). *Jefferson Ins. Co. v. Super. Ct. (May)*, 3 Cal. 3d 398, 402 (1970). FMV is most commonly determined "by way of market data on sales of comparable property." *Redevelopment Agency of Long Beach v. First Christian Church of Long Beach*, 189 Cal. Rptr. 749, 753 (Cal. Ct. App. 1983) (*disapproved of on other grounds by Los Angeles County Metro. Transp. Auth. v. Continental Dev. Corp.*, 16 Cal. 4th 694, 720 (1997)). In cases where there is no relevant market, however, the FMV may be "determined by any method of valuation that is just and equitable." *Id.* (quoting Cal. Code Civ. Proc. § 1263.320(b)). Specifically, "[r]ecognized alternatives to the market data approach to valuation are reproduction or replacement costs less depreciation or obsolescence." *Id.* (citing Cal. Evid. Code § 820).

Moreover, California courts establish that "[i]f [Insurers] want to determine 'actual cash value' on the basis of replacement cost less depreciation all [they] ha[ve] to do is say so in the policy . . . . This can be accomplished by using words such as *'actual cash value, with proper deduction for depreciation.'*" *Cheeks v. Cal. Fair Plan Ass'n*, 71 Cal. Rptr. 2d 568, 572 n.5 (Cal. Ct. App. 1998) (quoting *Hughes v. Potomac Ins. Co.*, 18 Cal. Rptr. 650, 658 (Cal. Ct. App. 1962)) (emphasis added). The policy provision at issue here, the valuation clause, contains exactly that language: "actual cash value (with proper deduction for depreciation) of the property destroyed."

Sierra contends that the dam's ACV should be calculated as the full replacement cost without any depreciation. None of the cases it cites supports that proposition, however, as they all included deductions for depreciation. *See Leslie Salt Co. v. St. Paul Mercury Ins. Co.*, 637 F.2d 657, 660 (9th Cir. 1981) ("the actual cash value of the property damaged . . . shall be . . . ascertained according to such actual cash value with proper deduction for depreciation"); *Redevelopment Agency of Long Beach v. First Christian Church of Long Beach*, 189 Cal. Rptr. at 753 ("[r]ecognized alternatives to the market data approach to valuation are reproduction or *replacement costs less depreciation or obsolescence.*") (emphasis added). Accordingly, the ACV for the Farad Dam, a structure without a sales

market, is determined using replacement cost reduced by the appropriate depreciation.

Although the district court did not explain in its final ruling the method by which it calculated the ACV of the dam, its reasoning may be gleaned from the record. In its ruling on Sierra's motion for reconsideration, the court explained "the most persuasive evidence" it considered "concerning the dam's actual cash value is a letter in which Sierra's insurance broker stated to Sierra's claims manager, 'We are only agreeing that the [actual cash value] is $1,261,200 and nothing else.'" The court also stated "[o]ther evidence pertinent to the court's decision includes an email from Sierra's broker [ ] agreeing to apply Hartford and Zurich's depreciation factors to the dam to reach an actual cash value of $1,261,200, subject to Sierra's claim's manager's review." But neither of these documents reflects Sierra's agreement to the ACV. Rather, they represent Sierra's insurance broker's recommendation to Sierra as to the ACV.

Although the district court correctly announced that it would base ACV on replacement cost of the dam less depreciation, it arrived at an amount for the dam's ACV, $1,261,200, which is not related to the figure it found as the replacement cost. The district court relied on its view that Sierra and the Insurers had agreed on the value of $1,261,200 as the ACV, but the court explicitly found that the parties

*did not agree* on that number, or any other number, as the ACV for the dam. As such, the district court's determination of ACV was clearly erroneous and must be vacated.

        *B.*        *Calculation of Replacement Cost—Effect of Building Ordinances*

A primary issue in this case is whether increased costs of repair are effectively excluded by the policy's Building Ordinance or Law Exclusion. The district court ruled that "replacement cost coverage of the dam includes design fees, permitting fees and other regulatory costs necessary to rebuild the dam." The court also ruled that "[t]he coverage available to Sierra included the increased costs of construction based on intervening changes in the law."

The relevant exclusion in the policy states, in pertinent part, "[t]his policy does not insure loss or damage caused by or resulting from . . . any increase in the loss due to any ordinance, law or regulation, rule or ruling restricting or affecting repair, alteration, use, operation, construction or installation . . . ." The Ninth Circuit has not addressed whether such a building ordinance or law exclusion is effective to limit the coverage for an insured structure to rebuilding the structure without costs for complying with any intervening building codes.

Case law from California appears to be split on the issue.[2] *Compare Fire Ins. Exch. v. Super. Ct. (Altman)*, 10 Cal. Rptr. 3d 617, 632-36 (Cal. Ct. App. 2004) (finding the exclusion only excludes damage caused by a building ordinance, but not the increased replacement costs due to a building ordinance where loss itself was caused by a covered peril) *with Bischel v. Fire Ins. Exch.*, 2 Cal. Rptr. 2d 575 (Cal. Ct. App. 1991) (finding the exclusion excludes increased replacement costs).  We certified the question whether such an exclusion is effective to exclude the increased costs of construction due to building ordinances to the California Supreme Court, *Sierra Pac. Power Co. v. Hartford Steam Boiler Inspection & Ins. Co.*, 665 F.3d 1166 (9th Cir. 2012), however, that court declined to provide guidance on the issue.  Forced to determine the state law, we choose to apply the most recent California Court of Appeal decision, *Altman*.

---

[2]     Other jurisdictions that have addressed this question have also reached differing conclusions.  *Compare Dupre v. Allstate Ins. Co.*, 62 P.3d 1024, 1029-30 (Colo. App. 2002), *Bering Strait School Dist. v. RLI Ins.*, 873 P.2d 1292, 1296 (Alaska 1994), *Farmers Union Mut. Ins. Co. v. Oakland*, 825 P.2d 554 (Mont. 1992) and *Garnett v. Transamerica Ins. Servs.*, 800 P.2d 656 (Idaho 1990) (interpreting similar language and holding perils exclusions do not operate to exclude increased costs to replace due to intervening changes in building ordinances) *with Spears v. Shelter Mut. Ins. Co.*, 73 P.3d 865, 867-69 (Okla. 2003) and *Dombrowsky v. Farmers Ins. Co. Of Wash.*, 928 P.2d 1127 (Wash. Ct. App. 1996) (finding exclusion does limit coverage).

The policy and exclusion at issue in *Altman* were substantially similar to the policy and exclusion in this case. In *Altman*, the court gave great weight to the fact that the exclusion for losses caused by enforcement of building codes or ordinances was in a section containing only perils exclusions. 10 Cal. Rptr. at. 632. There was no limiting language in the valuation section of the policy or in the insuring clause. *Id.* However, there is such limiting language in the standard form policy in California Insurance Code Section 2071. The *Altman* court stated, "[t]he exclusion's location in a long list of excluded perils, combined with the words 'caused directly or indirectly by,' indicate that its intended function is to exclude a peril, not to place a limit on replacement costs." 10 Cal. Rptr. at. 634 (citing *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1265 (1992)).

Similarly, here the exclusion at issue is in the section of the policy labeled "PERILS EXCLUDED" and, unlike the standard form policy of California Insurance Code Section 2071, there is no reference or limitation for increased costs due to changes in building codes in either the valuation section or the insuring clause of the policy. We hold, following *Altman*, that the exclusion at issue here excludes damage caused by the peril of building ordinances, but not the increased construction costs caused by intervening building ordinances when the loss itself is caused by a covered peril.

The Insurers also contend that any coverage for increased costs due to intervening changes in building codes or ordinances is limited to the $10 million in additional coverage offered in the Demolition and Increased Cost of Construction ("DICC") coverage extension. However, the DICC is a coverage extension that provides additional coverage for the extra expense incurred as a result of complying with intervening changes in building ordinances. It does not *limit* coverage otherwise available under the policy. As described above, the policy itself provides coverage for replacing structures destroyed by covered perils, even if the cost to do so is higher due to intervening changes in building codes. This coverage extension provides additional coverage not available elsewhere under the policy for demolishing undamaged portions of the building or structure if required by new building ordinances and rebuilding those demolished portions in accordance with the new building ordinances.

Here, the Farad Dam was completely destroyed by a flood; the loss was not caused by building codes. It is undisputed that flood is a covered peril under the policy. Coverage is not limited by the DICC coverage extension. The district court did not err in concluding that the replacement cost of the Farad Dam includes any increased costs due to intervening changes in building ordinances.

The district court found "[t]he evidence established that the actual estimated cost to replace Farad is $19,800,000." Insurers have not shown that this finding was clearly erroneous. We affirm the district court's finding of replacement cost. However, because the district court did not apply appropriate depreciation to this replacement cost to determine the ACV of the dam, we remand to the district court to determine the proper depreciation and to apply that depreciation to the replacement cost to determine the ACV.

**3.    $4 Million Sierra Spent In Preparation to Rebuild the Dam**

Insurers contend that the court erred in ruling that Sierra is entitled to recover approximately $4 million it has spent to date in preparation work prior to starting construction. Insurers argue that, because the policy does not pay replacement cost if the dam is not rebuilt within two years, they are not obligated to pay anything more than ACV (which they contend they have already done) until the dam is actually rebuilt.

The cases Insurers rely on involve policies that contain specific wording that the policy here does not. For example, the policy at issue in *Maryland Casualty Co. v. Knight*, 96 F.3d 1284 (9th Cir. 1996), contained a provision that said: "We will not pay on a replacement cost basis for any loss or damage: (1) *Until* the lost or damaged property is actually repaired or replaced; and, (2) Unless the repairs or

replacement are made as soon as reasonably possible after the loss or damage." *Id.* at 1292 (emphasis added). Each of the other cases Insurers cite have similar provisions, and all expressly state that replacement cost will not be paid *until* the property is actually replaced.[3]

The policy here has no such express timing provision. The policy limits only the *amount* of the Insurer's liability, but says nothing about *when* the Insurers will pay replacement cost. The valuation provision of the policy states, "in the event of loss or damage to property which is not repaired, rebuilt or replaced within two years from the date of loss or damage, this company shall not be liable for more than the actual cash value (with proper deduction for depreciation) of the property destroyed." This provision does not state that the Insurers will not pay more than ACV *until* the property is actually replaced. Rather, it merely limits the Insurers' ultimate liability if the property is not replaced within the allotted time.

_____

[3] *Ghoman v. New. Hampshire Ins. Co.*, 159 F. Supp. 2d 928, 934, n.6 (N.D. Tex. 2001) ("replacement costs will not be paid '[u]ntil the lost or damaged property is actually repaired or replaced'"); *Kolls v. Aetna Cas. & Sur. Co.*, 378 F. Supp. 392, 395 (S.D. Iowa 1974) *aff'd*, 503 F.2d 569 (8th Cir. 1974) (no replacement cost recoverable "[u]nless and until the damaged property is actually repaired or replaced with due diligence and dispatch"); *Truesdell v. State Farm Fire and Cas. Co.*, 960 F. Supp. 1511, 1513 (N.D. Okla. 1997) ("until actual repair or replacement is completed, we will pay the actual cash value of the damage to the buildings"). *But see Lerer Realty Corp v. MFB Mut. Ins. Co.*, 474 F.2d 410 (5th Cir. 1973)

Because "[i]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured[,]" *MacKinnon v. Truck Ins. Exch., Inc.*, 31 Cal. 4th 635, 648 (Cal. 2003), the district court was not wrong to find that the expenses already incurred by Sierra and necessary in preparation to replace the dam are recoverable before replacement is actually completed.

The district court went one step further, ruling that Sierra was entitled to recover this amount "even if replacement is not undertaken." We agree that the money Sierra has already spent in preparation for rebuilding should be included in the estimate of replacement cost which is then used to determine the ACV, and we assume it was included in the estimated replacement cost ($19,800,000) the district court found reasonable. However, if the district court intended that Sierra is entitled to recover expenses already incurred *in addition to* the ACV, there is no support for such a ruling. We hold that the amount Sierra has already spent is properly included in the calculation of replacement cost, which would then be reduced by the appropriate depreciation to determine the ACV,[4] but that Sierra is

[4]    Any amount Hartford has already paid Sierra Pacific would, of course, be deducted from the any recovery so that Sierra Pacific recovers an amount equal to, but not exceeding, the ACV.

-14-

not entitled to recover any amount in addition to the ACV of the dam unless the dam is actually rebuilt within the three-year limit imposed by the district court.[5]

**4.      Policy's Two-Year Limit on Time to Rebuild**

The district court found four separate reasons excusing Sierra from complying with the policy's two-year rebuilding requirement to recover replacement cost rather than ACV.  First, there is substantial evidence that regulatory challenges made it impossible for Sierra to rebuild before filing its suit, and the evidence details the years Sierra worked to obtain the necessary permits and easements in order to begin work on the replacement.  It was not clear error for the district court to conclude that it was impossible to comply with the two-year requirement.

Second, the court ruled that because the two-year condition was impossible to satisfy, it would be contrary to public policy to enforce it.  The Insurers cite no case that casts doubt on the district court's finding.  They failed to meet their burden to demonstrate that enforcing a condition that is impossible to satisfy would not be contrary to public policy in California.  Third, the district court found that

---

[5]      We leave it to the district court to determine whether the same depreciation should be applied to the costs incurred in preparation to rebuild as to the costs of construction of the dam itself, or whether the prerequisites to rebuilding, such as environmental impact studies and building permits, should be subject to a different depreciation rate.

the Insurers' conduct should prevent them from enforcing the two-year limit to recover replacement cost. The court found that Insurers unreasonably denied coverage and misled Sierra as to the amount of coverage ultimately available under the policy. An insurer's misrepresentations regarding available coverage, and its delay in informing an insured as to coverage available, has been held sufficient to base a finding of estoppel against enforcing time limits such as the two-year provision here. *City of Hollister v. Monterey Ins. Co.*, 81 Cal. Rptr. 3d 72, 98-99 (Cal. Ct. App. 2008).

Finally, the district court found that the two-year provision was not enforceable because it was waived through repeated extensions and that, because the Insurers granted each extension requested, the provision was not material. The court also noted that because the policy set the time to calculate the value of the dam as the time when, with diligence and dispatch the dam could be replaced, the Insurers were not prejudiced by any extension. The Insurers have not established that the court was clearly erroneous in so finding.

The district court further determined that a reasonable time to rebuild with diligence and dispatch was three years from the date of its order. While the Insurers argue the court was wrong in ruling the two-year period was unenforceable, neither party specifically argues why the three-year figure is wrong.

-16-

Therefore, we affirm the district court's determination that the time limit to rebuild the dam should be three years rather than two years.[6] We also agree with the district court that, should Sierra actually rebuild the dam within that time, it should be entitled to recover the difference between ACV and the replacement cost.

## 5.    Conclusion

We vacate the district court's finding that the ACV of the Farad Dam was $1,261,200, and remand for a determination of the ACV based on reducing the replacement cost of $19,800,000 by the appropriate depreciation. We affirm the district court's finding that Sierra is entitled to the $4 million it has already spent in replacement costs even though the dam has not actually been replaced yet, to the extent that this amount is included in the estimated replacement cost used to calculate the ACV. We affirm the district court's finding that the coverage available under the policy includes costs necessary to comply with current regulatory requirements and building codes. Finally we affirm the district court's

---

[6] Sierra filed a motion to stay the trial court's order so that the time during this appeal would be tolled and not count toward the three-year limit. Because we remand to the district court for further resolution, and the district court has indicated it intended the three-year period to begin running only after the litigation is final, including all periods of appeal, we are confident the district court will be able to fashion its final ruling in this matter to clarify that the three-year period granted for rebuilding Farad Dam should be tolled until the conclusion of the litigation, including during the pendency of any appeal by the Insurers. Therefore, we DENY Sierra's motion as moot.

finding that the two-year restriction for replacing the dam was impossible to comply with, therefore contrary to public policy and unenforceable. In sum, we **VACATE in part, AFFIRM in part, and REMAND**.

Each side to bear its own costs.